1
ROBBINS ARROYO LLP
BRIAN J. ROBBINS (190264)
2
GEORGE C. AGUILAR (126535)
LINDSEY C. HERZIK (313859)
3
600 B Street, Suite 1900
San Diego, CA 92101
4
Telephone: (619) 525-3990
Facsimile: (619) 525-3991
5
E-mail: brobbins@robbinsarroyo.com
        gaguilar@robbinsarroyo.com
6
        lherzik@robbinsarroyo.com

7
Attorneys for Plaintiff

8

9
UNITED STATES DISTRICT COURT

10
NORTHERN DISTRICT OF CALIFORNIA

11
SAN FRANCISCO DIVISION

12
| | |
|---|---|
| JOHN SOLAK, Derivatively on Behalf of DEPOMED, INC., | Case No. |
| Plaintiff, | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT FOR VIOLATION OF SECURITIES LAW, BREACH OF FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, AND UNJUST ENRICHMENT |
| v. | |
| ARTHUR J. HIGGINS, AUGUST J. MORETTI, JAMES P. FOGARTY, PETER D. STAPLE, KAREN A. DAWES, LOUIS J. LAVIGNE, JR., JAMES L. TYREE, JAMES A. SCHOENECK, DAVID B. ZENOFF, SAMUEL R. SAKS, VICENTE ANIDO, JR., and ROBERT G. SAVAGE, | |
| Defendants, | |
| -and- | |
| DEPOMED, INC., a California corporation, | |
| Nominal Defendant. | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys, submits this Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment.  Plaintiff alleges the following on information and belief, except as to the allegations specifically pertaining to plaintiff which are based on personal knowledge.  This complaint is also based on the investigation of plaintiff's counsel, which included, among other things, a review of public filings with the U.S. Securities and Exchange Commission ("SEC") and a review of news reports, press releases, and other publicly available sources.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a stockholder derivative action brought by plaintiff on behalf of nominal defendant Depomed, Inc. ("Depomed" or the "Company") against certain of its officers and directors for breaches of fiduciary duties and violations of law.  These wrongs resulted in hundreds of millions of dollars in damages to Depomed's reputation, goodwill, and standing in the business community.  Moreover, these actions have exposed the Company to hundreds of millions of dollars in potential liability for violations of state and federal law.

2.      Depomed is a specialty pharmaceutical company that develops, sells, licenses, and commercializes drug products to treat pain and other central nervous system conditions in the United States.  Opioids are among the portfolio of drugs the Company manufactures and markets, including NUCYNTA® (tapentadol) and Lazanda® (fentanyl).  NUCYNTA is designed as an immediate release version of tapentadol for the management of moderate to severe acute pain in adults.  Lazanda is a nasal spray for the management of breakthrough cancer pain in cancer patients eighteen years of age and older.

3.      Products like NUCYNTA and Lazanda are heavily scrutinized by drug enforcement and regulatory authorities.  According to the U.S. Drug Enforcement Agency ("DEA"), these highly addictive and powerful opioid agonists[1] fall under Schedule II of the Controlled Substances Act ("CSA").  Schedule II controlled substances, while having an accepted medical use, are considered

_____

[1] An agonist is a drug that binds to a receptor, activating the receptor to produce a biological response.

1   dangerous and have a high potential for abuse which may lead to severe psychological or physical

2   dependence in users.

3       4.    The sale, marketing, and use of pharmaceutical drugs are also heavily regulated by

4   the U.S. Food and Drug Administration ("FDA"). FDA-promulgated labeling rules are designed to

5   make information in prescription drug labeling easier for health care practitioners to access, read,

6   and use when making prescribing decisions. This is because drugs intended to help cure diseases or

7   other medical conditions can have injurious or even deadly consequences when used inappropriately

8   or by the wrong patient. Thus, it is illegal to market or promote drugs for any other purpose than the

9   uses approved by the FDA, also known as an "off-label" use. However, the short-term profitability

10  and boost in sales for potential off-label uses of drugs has proved too much for the executives and

11  directors of pharmaceutical companies to resist. Off-label marketing of drugs has firmly secured a

12  place in the business models of major pharmaceutical companies, forcing government agencies to

13  combat this dangerous epidemic by vigorously prosecuting and imposing criminal and civil penalties

14  on members of the pharmaceutical industry that violate these laws.

15      5.    In January 2015, Depomed announced an agreement with Janssen Pharmaceuticals,

16  Inc. ("Janssen") to acquire the U.S. rights to NUCYNTA (a drug used to treat pain) for $1.05 billion,

17  becoming the Company's new flagship product. According to Annual Reports on Forms 10-K filed

18  with the SEC after this acquisition, NUCYNTA and Lazanda have become Depomed's cornerstone

19  products in terms of sales, drastically increasing in importance during this time. Off-label sales

20  skyrocketed. In particular, NUCYNTA's annual sales increased in the U.S. from $189.9 million in

21  2015, shortly after its acquisition, to approximately $281.3 million in 2016, becoming the

22  Company's best seller. This marked a 48% year-over-year growth in sales of NUCYNTA in just one

23  year. NUCYNTA's sales during this period were greater than the sales of the Company's other

24  products (Gralise®, CAMBIA®, Zipsor®, and Lazanda) combined, consisting of 62% of Depomed's

25  total revenue. Sales of Lazanda also dramatically increased during this period, from $6.9 million in

26  2014 to $26 million by 2016, a dramatic 281% increase in just three years.

27      6.    This astronomical growth in sales, however, was fueled by the Company's illegal

28  practices in connection with its off-label marketing of NUCYNTA and Lazanda. In particular,

opioid markets, such as Depomed, promoted the use of opioids for all manner of pain management while downplaying the drugs' addictive nature, often focusing on family physicians and internal medicine doctors who were less knowledgeable about the dangers of opioids. These illegal, off-label marketing schemes, caused, directed, or permitted by the Individual Defendants (as defined herein), further exacerbated the ongoing opioid dependency epidemic in the U.S. that has resulted in the death of at least 30,000 people in 2015 alone according to the Centers for Disease Control and Prevention ("CDC").

7. On March 28, 2017, the U.S. Senate Committee on Homeland Security and Governmental Affairs announced that it was launching an investigation into pharmaceutical manufacturers' promotion of opioids. Senator Claire McCaskill, ranking minority member of the Committee, launched the investigation which is seeking marketing, sales, and addiction study material from Depomed, among other manufacturers of opioids. The investigation will explore whether Depomed has contributed to opioid overutilization and overprescription, citing overdose deaths in the last fifteen years that approached nearly 200,000.

8. As this news seeped into the market, Depomed's stock fell by nearly 16%, or a loss of $2.35 per share by March 31, 2017. The Company's stock closed at $12.55 per share on March 31, 2017, compared to $14.90 per share on March 27, 2017, erasing more than $145.9 million in market capitalization.

9. On August 7, 2017, Depomed confirmed that the Company had received a request for information from the U.S. Senate Committee on Homeland Security and Governmental Affairs in a Quarterly Report on Form 10-Q. Depomed further disclosed that it had received subpoenas related to its opioid sales and marketing from the Office of the Attorney General of Maryland and the U.S. Department of Justice.[2]

10. Reporting on its third fiscal quarter financial results in the same Form 10-Q on August 7, 2017, the Company further revealed that its adjusted earnings amounted to just $5 million,

_____

[2] The Company subsequently revealed that it also received subpoenas from the Office of the Attorney General of New Jersey and the Attorney General of Missouri.

and slashed its forecast for the full fiscal year 2017, predicting $10 million to $15 million less in revenue than previously reported and cutting its adjusted pretax operating profit projection by approximately 10%. Depomed was forced to admit that the increased regulatory oversight over the opioid markets and associated legal expenses affected the Company's revenues and earnings projections.

11.     These results revealed that the Company's illegal marketing scheme had a detrimental effect on the Company, prompting increased legal and regulatory scrutiny that exposed the Company to substantial criminal and civil penalties.  In addition, they showed that defendants James A. Schoeneck ("Schoeneck"), Peter D. Staple ("Staple"), Vicente Anido, Jr. ("Anido"), Karen A. Dawes ("Dawes"), Louis J. Lavigne, Jr. ("Lavigne"), Samuel R. Saks ("Saks"), and David B. Zenoff ("Zenoff") negligently made false and misleading statements in the Company's 2015 and 2016 Proxy Statements on Forms DEF 14A filed with the SEC.  The Forms DEF 14A were filed ahead of the Company's annual stockholders' meetings.  The 2015 and 2016 Proxy Statements included votes on the election of Depomed's Board of Directors (the "Board"), including defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff.  In connection with their efforts to secure reelection, approve incentives, and employee stock purchase plans, the above members of the Board stated that they were engaged in risk oversight and that the Audit Committee exercises oversight of the Company's financial statements.

12.     In the wake of the August 7, 2017 disclosure, Depomed's stock plummeted more than 33%, or $3.08 per share on August 8, 2017, to close at $6.15 compared to the previous trading day's closing of $9.23, erasing more than $194.3 million in market capitalization.  Overall, Depomed's stock price has fallen over 80%, from a high of $33.28 per share shortly after the acquisition of NUCYNTA, to a low of $6.15 per share on August 8, 2017, after revealing ongoing investigations, a loss of $27.14 per share.  Market capitalization fell more than $1.6 billion in little over two years.

13.     Moreover, with the U.S. opioid epidemic killing more than 100 people in the country a day, President Donald Trump declared a national emergency on October 26, 2017.  He directed the acting Health and Human Services Secretary, Eric Hargan, to declare a ninety-day public health emergency through the Public Health Service Act.  Signaling increased executive oversight of the

1   ongoing opioid crisis, the President pledged in his announcement to go after companies that produce

2   and distribute opioids to overprescribing "pill mill" medical practices, stating: "We will be bringing

3   some very major lawsuits against people and against companies that have been hurting our

4   communities."

5          14.     Further, as a direct result of this unlawful course of conduct, the Company is now the

6   subject of a federal securities class action lawsuit filed in the United States District Court for the

7   Northern District of California on behalf of investors who purchased Depomed's shares.

8   **JURISDICTION AND VENUE**

9          15.     Pursuant to 28 U.S.C. §1331 and section 27 of the Securities Exchange Act of 1934

10   (the "Exchange Act"), this Court has jurisdiction over the claims asserted herein for violations of

11   section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.  This Court has

12   supplemental jurisdiction over the remaining claims under 28 U.S.C. §1367.

13          16.     This Court has jurisdiction over each defendant named herein because each defendant

14   is either a corporation that conducts business in and maintains operations in this District, or is an

15   individual who has sufficient minimum contacts with this District to render the exercise of

16   jurisdiction by the District courts permissible under traditional notions of fair play and substantial

17   justice.

18          17.     Venue is proper in this Court in accordance with 28 U.S.C. §1391(a) because: (i)

19   Depomed maintains its principal place of business in this District; (ii) one or more of the defendants

20   either resides in or maintains executive offices in this District; (iii) a substantial portion of the

21   transactions and wrongs complained of herein, including the defendants' primary participation in the

22   wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties

23   owed to Depomed, occurred in this District; and (iv) defendants have received substantial

24   compensation in this District by doing business here and engaging in numerous activities that had an

25   effect in this District.

26   **INTRADISTRICT ASSIGNMENT**

27          18.     A substantial portion of the transactions and wrongdoings that gave rise to the claims

28   in this action occurred in the County of Alameda, and as such, this action is properly assigned to the

1   San Francisco division of this Court.

2   **THE PARTIES**

3   **Plaintiff**

4       19.    Plaintiff John Solak has continuously been a stockholder of Depomed since January

5   2017 and is a current Depomed stockholder.

6   **Nominal Defendant**

7       20.    Nominal defendant Depomed is a California corporation with principal executive

8   offices located at 7999 Gateway Boulevard, Suite 300, Newark, California. Depomed is a specialty

9   pharmaceutical company focused on pain and other central nervous system ("CNS") conditions. The

10  Company markets six medicines that are prescribed to treat conditions such as mild to severe acute

11  pain, moderate to severe chronic pain, neuropathic pain, migraine attacks and cancer-related pain.

12  Depomed has operations solely in the United States. As of December 31, 2016, all of the Company's

13  revenues from product sales were related to sales in the United States; however Depomed recognizes

14  license and royalty revenue from license agreements in the territories of the United States, Canada,

15  and Korea. As of December 31, 2016, Depomed had 490 full-time employees.

16  **Defendants**

17      21.    Defendant Arthur J. Higgins ("Higgins") is Depomed's President, Chief Executive

18  Officer ("CEO") and a director and has been since March 2017. Defendant Higgins is named as a

19  defendant in a related securities class action complaint that alleges he violated sections 10(b) and

20  20(a) of the Exchange Act. Defendant Higgins knowingly, recklessly, or with gross negligence: (i)

21  caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing

22  of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper

23  statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale

24  and marketing of its opioid products; and (iii) failed to maintain adequate disclosure procedures with

25  respect to Depomed's operations and risk management.

26      22.    Defendant August J. Moretti ("Moretti") is Depomed's Senior Vice President and

27  Chief Financial Officer and has been since January 2012. Defendant Moretti is named as a

28  defendant in a related securities class action complaint that alleges he violated sections 10(b) and

20(a) of the Exchange Act.  Defendant Moretti knowingly, recklessly, or with gross negligence: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; and (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management.  While in possession of material, nonpublic information concerning Depomed's true business health, defendant Moretti sold 30,000 shares of his stock for $572,797.49 in proceeds.  Depomed paid defendant Moretti the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $418,820 | $602,625 | $591,491 | $183,042 | $9,481 | $1,805,459 |
| 2015 | $386,036 | $489,570 | $378,560 | $226,199 | $10,174 | $1,490,539 |

23.     Defendant James P. Fogarty ("Fogarty") is Depomed's Chairman of the Board and has been since March 2017 and a director and has been since October 2016.  Defendant Fogarty knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; and (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management.  Depomed paid defendant Fogarty the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|-------------|-------------------|------------------------------------------|-------|
| 2016 | $16,250 | $179,992 | $196,242 |

24.     Defendant Staple is a Depomed director and has been since November 2003.  Defendant Staple was also Depomed's Chairman of the Board from March 2009 to March 2017.  Defendant Staple is a member of Depomed's Audit Committee and has been since October 2016.  Defendant Staple knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal

practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management; and (iv) made materially misleading statements in the Company's 2015 and 2016 Proxy Statements.  Depomed paid defendant Staple the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $93,125 | $119,982 | $213,107 |
| 2015 | $90,000 | $119,979 | $209,979 |

25.     Defendant Dawes is a Depomed director and has been since April 2008.  Defendant Dawes is also a member of Depomed's Audit Committee and has been since at least April 2015.  Defendant Dawes knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management; and (iv) made materially misleading statements in the Company's 2015 and 2016 Proxy Statements.  Depomed paid defendant Dawes the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $82,500 | $119,982 | $202,482 |
| 2015 | $82,500 | $119,979 | $208,479 |

26.     Defendant Lavigne is a Depomed director and has been since July 2013.  Defendant Lavigne is also Chairman of Depomed's Audit Committee and has been since April 2014 and member of that committee and has been since July 2013.  Defendant Lavigne knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate

improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management; and (iv) made materially misleading statements in the Company's 2015 and 2016 Proxy Statements. Depomed paid defendant Lavigne the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $75,000 | $119,982 | $194,982 |
| 2015 | $75,000 | $119,979 | $194,979 |

27.     Defendant James L. Tyree ("Tyree") is a Depomed director and has been since October 2016. Defendant Tyree was a member of Depomed's Audit Committee from at least October 2016 to at least July 2017. Defendant Tyree knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; and (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management. Depomed paid defendant Tyree the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $16,875 | $179,992 | $196,867 |

28.     Defendant Schoeneck was Depomed's President and CEO from April 2011 to March 2017 and a director from December 2007 to March 2017. Defendant Schoeneck is named as a defendant in a related securities class action complaint that alleges he violated sections 10(b) and 20(a) of the Exchange Act. Defendant Schoeneck knowingly, recklessly, or with gross negligence: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the

1   Company's sale and marketing of its opioid products; (iii) failed to maintain adequate disclosure

2   procedures with respect to Depomed's operations and risk management; and (iv) made materially

3   misleading statements in the Company's 2015 and 2016 Proxy Statements.  Depomed paid defendant

4   Schoeneck the following compensation as an executive:

| Year | Salary | Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation | Total |
|------|--------|--------------|---------------|----------------------------------------|------------------------|-------|
| 2016 | $787,500 | $2,362,290 | $2,308,415 | $694,000 | $14,865 | $6,167,070 |
| 2015 | $708,333 | $2,430,180 | $2,374,601 | $800,000 | $16,808 | $6,329,922 |

9   29.   Defendant Zenoff was a Depomed director from March 2007 to March 2017.

10  Defendant Zenoff knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal

11  practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or

12  allowed Depomed to disseminate improper statements concerning the potential heightened

13  regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed

14  to maintain adequate disclosure procedures with respect to Depomed's operations and risk

15  management; and (iv) made materially misleading statements in the Company's 2015 and 2016

16  Proxy Statements.  Depomed paid defendant Zenoff the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|-------------|-------------------|------------------------------------------|-------|
| 2016 | $75,000 | $119,982 | $194,982 |
| 2015 | $75,000 | $119,979 | $194,992 |

20  30.   Defendant Saks was a Depomed director from October 2012 to March 2017.

21  Defendant Saks knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal

22  practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or

23  allowed Depomed to disseminate improper statements concerning the potential heightened

24  regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed

25  to maintain adequate disclosure procedures with respect to Depomed's operations and risk

26  management; and (iv) made materially misleading statements in the Company's 2015 and 2016

27  Proxy Statements.  Depomed paid defendant Saks the following compensation as a director:

28

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $70,000 | $119,982 | $189,982 |
| 2015 | $70,000 | $119,979 | $189,979 |

31.     Defendant Anido was a Depomed director from February 2013 to May 2016. Defendant Anido was also a member of Depomed's Audit Committee from at least April 2014 to May 2016.  Defendant Anido knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management; and (iv) made materially misleading statements in the Company's 2015 and 2016 Proxy Statements.  Depomed paid defendant Anido the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2015 | $67,500 | $119,979 | $187,479 |

32.     Defendant Robert G. Savage ("Savage") was a Depomed director from October 2016 to August 2017.  Defendant Savage knowingly or recklessly: (i) caused or allowed Depomed to engage in illegal practices in connection with the sales and marketing of the Company's opioid products; (ii) caused or allowed Depomed to disseminate improper statements concerning the potential heightened regulatory and legal scrutiny on the Company's sale and marketing of its opioid products; and (iii) failed to maintain adequate disclosure procedures with respect to Depomed's operations and risk management.  Depomed paid defendant Savage the following compensation as a director:

| Fiscal Year | Fees Paid in Cash | Option and Restricted Stock Unit Awards | Total |
|---|---|---|---|
| 2016 | $15,000 | $179,992 | $194,992 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

33.    The defendants identified in ¶¶21-22, 28 are referred to herein as the "Officer Defendants."   The defendants identified in ¶¶21, 23-32 are referred to herein as the "Director Defendants."   The defendants identified in ¶¶24-27, 31 are referred to herein as the "Audit Committee Defendants."   Collectively, the defendants identified in ¶¶21-32 are referred to herein as the "Individual Defendants."

### DUTIES OF THE INDIVIDUAL DEFENDANTS

**Fiduciary Duties**

34.    By reason of their positions as officers and directors of the Company, each of the Individual Defendants owed and owe Depomed and its stockholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage Depomed in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of Depomed and not in furtherance of their personal interest or benefit.

35.    To discharge their duties, the officers and directors of Depomed were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of Depomed were required to, among other things:

(a)    conduct the affairs of the Company in an efficient, business-like manner in compliance with all applicable laws, rules, and regulations so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(b)    remain informed as to how Depomed conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws; and

(c)    ensure that the Company complied with its legal obligations and requirements — including requirements involving the filing of accurate financial and operational information with the SEC—and refrain from engaging in deceptive or fraudulent conduct.

**Depomed's Code of Business Conduct and Ethics**

36.     The Company implemented a Code of Business Conduct and Ethics (the "Code of Conduct"), last promulgated February 5, 2015.  The Code of Conduct applies to all directors, officers, and employees of the Company.  Each person covered by the Code of Conduct must certify to their receipt and understanding of their obligations under the Code of Conduct.  As to lawful and ethical behavior, the Code of Conduct states:

> The foundation on which this Code of Conduct is built is obeying the law and acting ethically.  It is the Company's policy that you conduct business in accordance with applicable federal, state and local laws, rules and regulations and with the laws, rules and regulations of other countries in which the Company does business which are not in conflict with your responsibilities under United States laws and regulations.  In addition, the Company's policy requires that you adhere to the highest standard of business ethics and conduct.
>
> You must be alert and sensitive to situations that could result in illegal, unethical, or improper action.  When you are faced with a business decision that seems to have ethical overtones, here are some questions that should be helpful to determine if your actions are proper:
>
> - Do I have all the necessary facts?
>
> - Am I informed about all of the legal implications?
>
> - Who has an important stake in the outcome (e.g., employees, customers, suppliers, etc.), and what is that stake?
>
> - Does the issue raise ethical issues that go deeper than legal or institutional concerns?
>
> - What are the options for acting, and which options will produce the most good and do the least harm? Which options respect the dignity of all stakeholders?
>
> If you remain uncertain about what to do, if you need advice, or if you have reason to believe that a United States or foreign law could be violated in connection with Company business or that this Code of Conduct has been violated in any way, notify your supervisor, the Legal Department, the Compliance Officer or the Chairman of the Audit Committee.

37.     The Code of Conduct requires honest and ethical conduct, and compliance with applicable governmental laws, rules, and regulations, stating:

This Code of Ethics is promulgated by the Board of Directors under Section 406 of the Sarbanes Oxley Act of 2002 and the rules of the SEC promulgated thereunder and applies to all employees, officers and directors of the Company. It should be read in conjunction with the rest of this Code of Conduct and it contains standards reasonably necessary to promote:

- Honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- Full, fair, accurate, timely, and understandable disclosure in the periodic reports required to be filed by the issuer and in other public communications; and

- Compliance with applicable governmental laws, rules and regulations.

You must:

a. Act with honesty and integrity and be able to identify and appropriately handle actual or apparent conflicts of interest. You should recognize that even the appearance of a conflict of interest can damage the Company. A conflict of interest may exist because of a relationship of yours or of a family member that could cause a conflict with your ability to perform your job responsibilities.

b. Produce, or cause to be produced, full, fair, accurate, timely and understandable disclosure in reports and documents that the Company files with or submits to the SEC and in other public communications.

c. Comply with applicable governmental laws, rules and regulations.

d. Promptly report any violation of this Code of Ethics to the Chairman of the Audit Committee or the Compliance Officer. Reports also may be made anonymously via the Company's confidential reporting hotline.

e. Promote ethical behavior by Company officers and employees involved in financial reporting.

You will be held accountable for your adherence to this Code of Ethics. Your failure to observe the terms of this Code of Ethics may result in disciplinary action, up to and including immediate termination of your employment.

If you are an executive officer or director, any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the Chairman of the Audit Committee. If you are not an executive officer or director, any request by you for a waiver of any provision of this Code of Ethics must be in writing and addressed to the Compliance Officer.

With regard to executive officers and directors, the Board will have the sole and absolute discretionary authority, acting upon such recommendation as may be made by the Audit Committee, to approve any waiver from this Code of Ethics. Any waiver for executive officers or directors from this Code of Ethics will be disclosed within four days on Form 8-K or any other means approved by the Securities and Exchange Commission.

38.     The Code of Conduct further prohibits off-label promotion of the Company's drugs, stating:

Each employee or other Company representative, in performing his or her duties, is responsible for truthfully conveying product attributes in accordance with government approved labeling. You must not misstate facts or create misleading impressions in any labeling, advertising, packaging, literature or public statements. You must not promote a product for a use other than that specified in the approved product label. Omissions of important facts, safety information or wrongful emphasis of material may be misleading; the total impression of the message must be fairly balanced.

Many laws, regulations, guidelines, policies and procedures are applicable to the sale and marketing of our products, including regulations of the U.S. Food and Drug Administration (the "FDA"), the PhRMA Code on Interactions with Healthcare Professionals (the "PhRMA Code") and the Office of Inspector General (the "OIG") guidelines, among others. The Company provides specific training in these matters to its sales and marketing personnel and others in the Company involved in these activities. Violations of these laws, regulations, policies and procedures, including violations of the CCP, will lead to disciplinary actions, up to and including immediate termination of employment.

Vendors, consultants and third party service suppliers of services in connection with our sales and marketing activities must comply with all applicable laws, regulations, guidelines, policies and procedures. Each employee who engages a third party to perform these activities is responsible to ensure compliance by the third parties.

**Control, Access, and Authority**

39.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of Depomed, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

40.     Because of their advisory, executive, managerial, and directorial positions with Depomed, each of the Individual Defendants had access to adverse, nonpublic information about the

1   financial condition, operations, and improper representations of Depomed, including information
2   regarding the several factors negatively impacting the Company's performance.

3          41.     At all times relevant hereto, each of the Individual Defendants was the agent of each
4   of the other Individual Defendants and of Depomed, and was at all times acting within the course
5   and scope of such agency.

6   **Additional Duties of the Audit Committee Defendants**

7          42.     In addition to these duties, the Audit Committee Defendants, defendants Anido,
8   Dawes, Lavigne, Staple, and Tyree, owed specific duties to Depomed to assist the Board in
9   overseeing the Company's compliance with legal and regulatory requirements.   The Audit
10  Committee is further charged with discussing significant risk areas and the steps management has
11  taken to monitor, control, and report such exposures to the full Board.   Additionally, the Audit
12  Committee has the duty to review with the Company's counsel any legal matters that may have a
13  material impact on the Company's financial statements, the Company's compliance with applicable
14  laws and regulations, and material reports or inquiries received from governmental authorities.   In
15  conjunction with these duties, the Audit Committee has the authority to conduct any investigation
16  appropriate to fulfill these responsibilities.   Finally, the Audit Committee is tasked with reviewing
17  and approving the Company's filings with the SEC, and preparing required reports in the Company's
18  proxy statements.

19  **Breaches of Duties**

20         43.     Each Individual Defendant, by virtue of his or her position as a director and/or
21  officer, owed to the Company and to its stockholders the fiduciary duty of loyalty and good faith and
22  the exercise of due care and diligence in the management and administration of the affairs of the
23  Company, as well as in the use and preservation of its property and assets.   The conduct of the
24  Individual Defendants complained of herein involves a knowing and culpable violation of their
25  obligations as officers and directors of Depomed, the absence of good faith on their part, and a
26  reckless disregard for their duties to the Company that the Individual Defendants were aware or
27  reckless in not being aware posed a risk of serious injury to the Company.

28

44.     The Individual Defendants breached their duty of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to engage in making improper statements to the public and Depomed's stockholders, improper practices that wasted the Company's assets, and caused Depomed to incur substantial damage.

45.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of Depomed, were able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein.  The Individual Defendants also failed to prevent the other Individual Defendants from taking such illegal actions.  As a result, and in addition to the damage the Company has already incurred, Depomed has expended, and will continue to expend, significant sums of money.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants, collectively and individually, initiated a course of conduct that was designed to and did: (i) conceal harmful information relating to Depomed's internal controls and disclosure procedures that rendered statements in the Company's SEC filings and public announcements improper; (ii) deceive the investing public, including stockholders of Depomed, regarding the Individual Defendants' management of Depomed's operations; and (iii) enhance the Individual Defendants' executive and directorial positions at Depomed and the profits, power, and prestige that the Individual Defendants enjoyed as a result of holding these positions.  In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants, collectively and individually, took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise, and/or common course of conduct.  During this time, the Individual Defendants caused the Company to issue improper financial statements.

49.    The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' violations of law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment; and to conceal adverse information concerning the Company's operations, financial condition, and future business prospects.

50.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully or recklessly release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

51.    Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted in the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## **FACTUAL BACKGROUND**

52.    Depomed is a specialty pharmaceutical company that includes several branded opioid drug products designed to treat neurology, pain, and diseases of the CNS.  Among those products are Lazanda and NUCYNTA.

53.    On January 15, 2015, the Company entered into an Asset Purchase Agreement with Janssen, wherein the Company would acquire the NUCYNTA franchise of opioid drug products in the U.S. for $1.05 billion in cash.  The acquisition included NUCYNTA ER (tapentadol) extended release tablets indicated for the management of pain, including neuropathic pain associated with diabetic peripheral neuropathy (DPN), severe enough to require daily, around-the-clock, long-term opioid treatment; NUCYNTA IR (tapentadol), an immediate release version of tapentadol, for management of moderate to severe acute pain in adults; and NUCYNTA (tapentadol) oral solution, an approved oral form of tapentadol that has not been commercialized.  The Company closed the acquisition on April 2, 2015, and proclaimed that NUCYNTA was now the "flagship asset" in

1   Depomed's portfolio of pain and neurology specialty pharmaceuticals in a press release issued that

2   same day.

3         54.    The FDA approved NUCYNTA for the management of moderate to severe acute pain

4   in patients eighteen years of age and older.  The FDA further approved Lazanda for the management

5   of breakthrough cancer pain in cancer patients eighteen years of age and older.

6         55.    The acquisition of NUCYNTA rounded out Depomed's portfolio of opioid agonist

7   drug products, which already included Lazanda.  Lazanda contains fentanyl and NUCYNTA

8   contains tapentadol, each listed under the CSA as Schedule II narcotics.  Schedule II drugs, while

9   permissible for medical uses, are highly regulated by the DEA and FDA due to their high potential

10  for abuse leading to severe psychological and physical dependence.

11        56.    Dependency on prescribed opioids has caused a national epidemic that has threatened

12  the health and safety of millions of Americans.  An article published by *The New York Times* on

13  January 6, 2017 entitled "Inside a Killer Drug Epidemic: A Look at America's Opioid Crisis" shed

14  light on crisis that took the lives of 33,000 people in the U.S. in 2015 alone.  Overdose deaths as a

15  result are "nearly equal to the number of deaths from car crashes" and "surpassed gun homicides" in

16  2015.  Another article published by *CNBC* entitled "Americans Consume Vast Majority of the

17  World's Opioids" on April 27, 2016, highlighted a national survey by the National Safety Council

18  which revealed "that about 99 percent of physicians exceed the recommended three-day dosage

19  limit, with a quarter of them writing prescriptions for a full month and thus overprescribing these

20  types of medications."  The article stated that the situation was causing politicians, advocacy groups,

21  and government organizations to enact stricter measures to curb the crisis.  Senator Pat Toomey,

22  quoted in the article, said that Congress had "a clear awareness now of how serious this problem

23  really is."

24      **<u>DEPOMED'S ILLEGAL MARKETING OF NUCYNTA AND LAZANDA</u>**

25  **Regulations Prohibiting Off-Label Marketing**

26        57.    The products developed and marketed by Depomed are subject to various federal

27  laws and regulations governed by the FDA, which is responsible for protecting and promoting public

28  health through the regulation and supervision of, among other things, prescription drugs.  The

Federal Food, Drug, and Cosmetic Act ("FDCA") gives authority to the FDA to oversee the safety of food, drugs, and cosmetics.

58.     Under the FDCA, 21 U.S.C. §§301-97, and the Public Health Services Act ("PHSA"), 42 U.S.C. §262, *et seq.*, drug manufacturers may not market or promote a drug for "off-label" use, or for a use the FDA has not approved.  *See* 21 U.S.C. §331, §352; 42 U.S.C. §262(a)(1) and (b); 21 C.F.R. §601.12.  A drug may not be marketed or sold in the United States unless the FDA has approved the drug as safe and effective for its intended use and intended indication.  The intended indications for use of the drug are provided in the drug's label which the FDA reviews and approves.  *See* 21 U.S.C. §355-1(d)(1) and (2).  Violation of the FDCA and PHSA are punishable by criminal and civil penalties including substantial fines.  21 U.S.C. §333.

59.     In addition to prohibiting manufacturers from directly marketing and promoting a drug's off-label uses, Congress and the FDA have enacted laws and regulations intended to prevent manufacturers from using indirect means to accomplish this same improper end.  Two of the most utilized indirect promotional strategies are: (i) manufacturer dissemination of medical and scientific publications concerning the off-label use of its products; and (ii) manufacturer support for Continuing Medical Education ("CME") programs that focus on off-label uses.  To combat these violations, the FDA places stringent requirements on drug marketing materials and requires that CME programs must be truly independent of drug companies such that they are "free from the supporting company's influence and bias."  62 Fed. Reg. 64074, 64081 (1997).

60.     In enforcing the FDCA, the FDA may bring claims under the FCA, 31 U.S.C. §3729, which protects against attempts to defraud the federal government by prohibiting a person from making, or conspiring to make, a false record, claim, or statement concerning the federal government.  The submission of claims to government programs is a reasonably foreseeable consequence to manufacturers who promote off-label use.  Providers' claims for payment from government programs, such as Medicare and Medicaid, for drugs used off-label as a result of illegal promotions or marketing are false or fraudulent.  Accordingly, FCA enforcement is appropriate because manufacturers who promote products off-label "cause" claims for reimbursement for off-

label uses to be submitted to the federal government through programs such as Medicare and Medicaid.

**The Individual Defendants Knew They Faced Liability for the Off-Label Marketing of NUCYNTA and Lazanda**

61.     Depomed faces significant liability for FDCA, PHSA, and FCA violations relating to the off-label marketing of NUCYNTA and Lazanda.  The Individual Defendants either knew of Depomed's off-label marketing of NUCYNTA and Lazanda or, in breach of their fiduciary duties, knowingly failed to exercise their fiduciary duties to monitor Depomed's compliance with off-label marketing laws.

62.     The Individual Defendants knew, and it was in fact Depomed's goal, that its illegal marketing scheme for off-label and medically unnecessary uses of NUCYNTA and Lazanda would result in higher number of written prescriptions for these opioid drug products.  As a consequence of the increase in prescriptions, there has been a dramatic increase in the dependency among patients on these drugs that have created a national health crisis.  This crisis has further prompted increased Congressional, Executive, legal, and regulatory scrutiny over Depomed's illegal marketing scheme.

## IMPROPER STATEMENTS

63.     Beginning in 2015, the Individual Defendants made repeated improper statements about the Company's promising financial standing and the effectiveness of its disclosure controls and procedures.  In truth, the Individual Defendants were in breach of their fiduciary duties by engaging in or causing the Company to engage in an unlawful scheme to market its opioid drug products for off-label uses, increase patient dependency on those drugs, and downplay the risk of addiction associated with the use of those drugs.

64.     On February, 26, 2015, the Company filed an Annual Report on Form 10-K with the SEC for the fiscal quarter and year ended December 31, 2014 (the "2014 Form 10-K").  The 2014 Form 10-K reported, for the year, net income of $131.7 million, or $2.05 diluted net income per share, on revenue of $390.3 million, compared to net income of $43.3 million, or $0.75 diluted net income per share, on revenue of $134.2 million for 2013.  For the quarter, the 2014 Form 10-K reported net income of $94.6 million, or $1.23 diluted net income per share, on revenue of $194.6

million, compared to net income of $41.8 million, or $0.72 diluted net income per share, on revenue of $40.6 million for the same quarter in the previous year. Defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff signed the 2014 Form 10-K. These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

65.     The 2014 Form 10-K also stated that upon the acquisition of NUCYNTA, the Company would be increasing its marketing and promotion of the drug, but failed to disclose that its sales force would push healthcare providers to use the drugs for off-label purposes. The Form 10-K stated:

> **MARKETING AND SALES**
>
> We have developed capabilities in various aspects of our commercial organization through our commercialization of Gralise®, CAMBIA®, Zipsor® and Lazanda®, including sales, marketing, manufacturing, quality assurance, wholesale distribution, medical affairs, managed market contracting, government price reporting, compliance, maintenance of the product NDA and review, and submission of promotional materials. Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.
>
> Our sales organization includes 188 full-time sales representatives. If we consummate the NUCYNTA® Acquisition, we expect to significantly increase the number of sales representatives. Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States. Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

66.     The 2014 Form 10-K additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

> ***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products

by pharmaceutical companies.  The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained.  If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

67.     Moreover, the 2014 Form 10-K reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the United States and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with Gralise®, Zipsor®, Lazanda® and CAMBIA®, as well as marketing activities related to any other products which we may acquire, such as NUCYNTA®, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.   The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements.   In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.  For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal false claims laws prohibit any person from· knowingly presenting, or causing to be presented, a false claim for payment to the federal government.  Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

68.     The 2014 Form l0-K also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations may adversely affect our business.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations

applicable to the pharmaceutical industry could potentially affect our business. For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, United States Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

69.     The 2014 Form 10-K contained certifications by defendants Schoeneck and Moretti pursuant to sections 302 and 906 of Sarbanes-Oxley Act of 2002 ("SOX") that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

70.     On May 11, 2015, the Company filed a Quarterly Report on Form l0-Q with the SEC reporting on Depomed's financial and operating results for the fiscal quarter ended March 31, 2015 (the "1Q2015 Form 10-Q").  Defendants Schoeneck and Moretti signed the 1Q2015 Form 10-Q. The 1Q2015 Form 10-Q reported, for the period, a net loss of $11.6 million, or $0.20 diluted net income loss per share, on revenue of $32.2 million, compared to net income of $17.9 million, or $0.30 diluted net income per share, on revenue of $76.5 million for the same quarter in the previous year. The 1Q2015 Form 10-Q omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

71.     The 1Q2015 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

> *We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.*
>
> Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory

agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies.  The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained.  If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions.  In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

72.    Moreover, the 1Q2015 Form 10-Q reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.  The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements.  In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.  For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government.  Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

73.     The 1Q2015 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

> **Changes in laws and regulations may adversely affect our business.**
>
> The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

74.     The 1Q2015 Form l0-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

75.     On August 3, 2015, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial and operations results for the fiscal quarter ended June 30, 2015 (the "2Q2015 Form 10-Q").  Defendants Schoeneck and Moretti signed the 2Q2015 Form 10-Q.  The 2Q2015 Form 10-Q reported, for the period, a net loss of $21.6 million, or $0.36 diluted net income loss per share, on revenue of $94.5 million, compared to net income of $12.7 million, or $0.21 diluted net income per share, on revenue of $67.7 million for the same quarter in the previous year. These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

76.     The 2Q2015 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

> **We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

77.     Moreover, the 2Q 2015 Form 10-Q reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

78.     The 2Q2015 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

**_Changes in laws and regulations may adversely affect our business._**

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For example, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse.  At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.  The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

79.     The 2Q2015 Form 10-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

80.     On November 9, 2015, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended September 30, 2015 (the "3Q2015 Form 10-Q").  Defendants Schoeneck and Moretti signed the 3Q2015 Form 10-Q.  The 3Q2015 Form 10-Q reported, for the period, a net loss of $11.7 million, or $0.20 diluted net income loss per share, on revenue of  $l04.8 million, compared to net income of $6.4 million, or $0.ll diluted net income per share, on revenue of $51.4 million for the same quarter in the previous year.  These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

81.     The 3Q2015 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

**_We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs._**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

82.     Moreover, the 3Q2015 Form 10-Q reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

83.     The 3Q2015 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations may adversely affect our business.***

> The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. As an example, we were named as a defendant in a case brought by the City of Chicago against a number of Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

84.     The 3Q2015 Form 10-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

85.     On February 26, 2016, the Company filed an Annual Report on Form 10-K with the SEC reporting its financial and operating results for the fiscal quarter and year ended December 31, 2015 (the "2015 Form 10-K"). Defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff signed the 2015 Form 10-K. For the year, the 2015 Form 10-K reported a net loss of $75.7 million, or $1.26 diluted net income loss per share, on revenue of $342.7 million, compared to net income of $131.7 million, or $2.05 diluted net income per share, on revenue of $390.3 million for fiscal year 2014. For the quarter, the 2015 Form 10-K reported a net loss of $30.6 million, or $0.51 diluted net income loss per share, on revenue of $111.1 million, compared to net income of $94.6 million, or $1.23 diluted net income per share, on revenue of $194.6 million for the same quarter in the previous year. These defendants omitted or failed to disclose that the Company was

engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

86.     The 2015 Form 10-K also stated that the Company was engaged in marketing and sales of its opioid products, but failed to disclose that its sales force would push healthcare providers to use the drugs for off-label purposes.  The 2015 Form 10-K stated:

**MARKETING AND SALES**

We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory.  Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes approximately 300 full-time sales representatives.  Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States.  Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

87.     The 2015 Form 10-K additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

88.     Moreover, the 2015 Form 10-K reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.   The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements.   In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.  For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government.  Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

89.     The 2015 Form 10-K also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations may adversely affect our business.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. As an example, we were named as a defendant in a case brought by the City of Chicago against a number of Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.  This case against the Company was recently dismissed.  At the federal level; the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.  The DEA continues to increase its efforts to

hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

90.     The 2015 Form 10-K contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

91.     On May 6, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC, providing its financial and operating results for the fiscal quarter ended March 31, 2016 (the "1Q2016 Form 10-Q").  Defendants Schoeneck and Moretti signed the 1Q2016 Form 10-Q.  The 1Q2016 Form 10-Q reported, for the period, a net loss of $20.9 million, or $0.34 diluted net income loss per share, on revenue of $104.7 million, compared to a net loss of $11.6 million, or $0.20 diluted net income loss per share, on revenue of $32.2 million for the same quarter in the previous year.  These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

92.     The 1Q2016 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

*We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.*

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with

the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

93.     Moreover, the 1Q2016 Form 10-Q reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA® ER, NUCYNTA®, Gralise®, CAMBIA®, Zipsor® and Lazanda®, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.  The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements.  In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.  For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government.  Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

94.     The 1Q2016 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations may adversely affect our business.***

The manufacture, marketing, sate, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse.  As an example, we were named as a defendant in a case brought by the City of Chicago against a number of

Pharmaceutical Companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.  This case against the Company was dismissed.  At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.   The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  Further the FDA has recently announced that it will require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death.  These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

95.     The 1Q2016 Form 10-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

96.     On August 3, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended June 30, 2016 (the "2Q2016 Form 10-Q").  Defendants Schoeneck and Moretti signed the 2Q2016 Form 10-Q.  The 2Q2016 Form 10-Q reported, for the period, a net loss of $10.5 million, or $0.17 diluted net income loss per share, on revenue of $116.6 million, compared to a net loss of $21.6 million, or $0.36 diluted net income loss per share, on revenue of $94.5 million for the same quarter in the previous year.  These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

97.     The 2Q2016 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

**_We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs._**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA.  Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties.  Although the FDA and other regulatory

1   agencies do not regulate a physician's choice of treatments, the FDCA and FDA

2   regulations restrict communications on the subject of off-label uses of drug products
    by pharmaceutical companies.  The Office of Inspector General of the Department of

3   Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ)

4   all actively enforce laws and regulations prohibiting promotion of off-label use and
    the promotion of products for which marketing clearance has not been obtained.  If

5   the OIG or the FDA takes the position that we are or may be out of compliance with
    the requirements and restrictions described above, and we are investigated for or

6   found to have improperly promoted off-label use, we may be subject to significant
    liability, including civil and administrative remedies as well as criminal sanctions.  In

7   addition, management's attention could be diverted from our business operations and
    our reputation could be damaged.

8       98.    Moreover, the 2Q2016 Form 10-Q reported on the substantial regulation in the U.S.

9   of the Company's opioid drug products, stating:

10      ***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any
        failure by us or our collaborative partners to comply with applicable statutes or***

11      ***regulations could adversely affect our business.***

12      All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise,

13      CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other
        products which we may acquire, or for which we obtain regulatory approval, will be

14      subject to numerous federal and state laws governing the marketing and promotion of
        pharmaceutical products.  The FDA regulates post-approval promotional labeling and

15      advertising to ensure that they conform to statutory and regulatory requirements.  In
        addition to FDA restrictions, the marketing of prescription drugs is subject to laws

16      and regulations prohibiting fraud and abuse under government healthcare programs.
        For example, the federal healthcare program anti-kickback statute prohibits giving

17      things of value to induce the prescribing or purchase of products that are reimbursed

18      by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal
        false claims laws prohibit any person from knowingly presenting, or causing to be

19      presented, a false claim for payment to the federal government.  Under this law, in
        recent years, the federal government has brought claims against drug manufacturers

20      alleging that certain marketing activities caused false claims for prescription drugs to
        be submitted to federal programs.  Many states have similar statutes or regulations

21      that apply to items and services reimbursed under Medicaid and other state programs,

22      and, in some states, such statutes or regulations apply regardless of the payer.  If we,
        or our collaborative partners, fail to comply with applicable FDA regulations or other

23      laws or regulations relating to the marketing of our products, we could be subject to
        criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion

24      of our products from reimbursement under government programs, as well as other

25      regulatory actions against our product candidates, our collaborative partners or us.

26      99.    The 2Q2016 Form l0-Q also made a general disclaimer about the adverse impact of

27   changes in regulations and laws, stating:

28      ***Changes in laws and regulations may adversely affect our business.***

- 36 -

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids. In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to limit the duration and quantity of initial prescriptions of immediate release form of opiates. We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA has recently announced that it will require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

100.    The 2Q2016 Form 10-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

101.    On November 7, 2016, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended September 30, 2016 (the "3Q2016 Form 10-Q"). Defendants Schoeneck and Moretti signed the 3Q2016 Form 10-Q. The 3Q2016 Form 10-Q reported, for the period, a net loss of $12.8 million, or $0.21 diluted net income loss per share, on revenue of $110.5 million, compared to a net loss of $11.7 million, or $0.20 diluted net income loss per share, on revenue of $104.8 million for the same quarter in the previous year. These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

102.   The 3Q2016 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

**We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.**

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use end the promotion of products for which marketing clearance has not been obtained. If the OIG or the FDA takes the position that we are or may be out of compliance with the requirements and restrictions described above, and we are investigated for or found to have improperly promoted off-label use, we may be subject to significant liability, including civil and administrative remedies as well as criminal sanctions. In addition, management's attention could be diverted from our business operations and our reputation could be damaged.

103.   Moreover, the 3Q2016 Form 10-Q reported on the substantial regulation in the U.S. of the Company's opioid drug products, stating:

**Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.**

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products which we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other

laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

104.    The 3Q2016 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse.  The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids.  In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases.  These and other initiatives may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.  We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.  This case against the Company was dismissed.  At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.  The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  Further, the FDA has recently announced that it will require "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death.  These and other changes in laws and regulations could adversely affect our business, financial condition and results of operations.

105.    The 3Q2016 Form 10-Q contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit

to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

106.    On February 24, 2017, the Company filed an Annual Report on Form 10-K with the SEC reporting its financial and operating results for the fiscal quarter and year ended December 31, 2016 (the "2016 Form 10-K").  Defendants Schoeneck, Moretti, Staple, Dawes, Fogarty, Lavigne, Saks, Savage, Tyree, and Zenoff signed the 2016 Form 10-K.   The 2016 Form 10-K reported, for the fiscal year 2016, a net loss of $88.7 million, or $1.45 diluted net income loss per share, on revenue of $455.8 million, compared to a net loss of $75.7 million, or $1.26 diluted net income loss per share, on revenue of $342.7 million for 2015.  For the quarter, the 2016 Form 10-K reported a net loss of $44.3 million, or $0.72 diluted net income loss per share, on revenue of $123.9 million, compared to a net loss of $30.6 million, or $0.51 diluted net income loss per share, on revenue of $111.1 million for the same quarter in the previous year.  These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

107.    The 2016 Form 10-K also stated that the Company was engaged in marketing and sales of its opioid products, but failed to disclose that its sales force would push healthcare providers to use the drugs for off-label purposes.  The 2016 Form 10-K stated:

**MARKETING AND SALES**

We have developed capabilities in various aspects relating to the commercialization of our marketed products, including sales, marketing, manufacturing, quality assurance, wholesale distribution, managed market contracting, government price reporting, medical affairs, compliance, and regulatory.  Members of our commercial organization are also engaged in the commercial and marketing assessments of other potential product candidates.

Our sales organization includes approximately 300 full time sales representatives.  Our sales force primarily calls on pain specialists, neurologists and primary care physicians throughout most of the United States.  Our marketing organization is comprised of professionals who have developed a variety of marketing techniques and programs to promote our products, including promotional materials, speaker programs, industry publications, advertising and other media.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

108.    Moreover, the 2016 Form 10-K additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as marketing activities related to any other products that we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products.  The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements.  In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs.  For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid.  In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government.  Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs.  Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer.  If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions, and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

109.    The 2016 Form 10-K also generally commented on the potential adverse impact that changes in regulations and laws could have on the Company's business, stating:

***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation.  Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business.  For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse.  The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids.  In addition states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug

databases.  These and other initiatives may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations.  We were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers.  This case against the Company was dismissed.  At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue.  The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances.  In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education.  Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death.  In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S.  These and other changes, and potential changes in laws and regulations, including those that have the effect of reducing the overall market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

110.   The 2016 Form 10-K contained certifications by defendants Schoeneck and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

111.   On May 10, 2017, the Company filed a Quarterly Report on Form 10-Q with the SEC reporting its financial and operating results for the fiscal quarter ended March 31, 2017 (the "lQ2017 Form 10-Q").  Defendants Higgins and Moretti signed the 1Q2017 Form 10-Q.  The 1Q2017 Form 10-Q reported, for the period, a net loss of $26.7 million, or $0.43 diluted net income loss per share, on revenue of $90.4 million, compared to a net loss of $20.9 million, or $0.34 diluted net income loss per share, on revenue of $104.7 million for the same quarter in the previous year.  These defendants omitted or failed to disclose that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency on those drugs, and downplaying the risk of addiction associated with the use of those drugs.

112.   The 1Q2017 Form 10-Q additionally acknowledged the significant liability the Company would incur if it engaged in the promotion of opioids for off-label uses, stating:

***We may incur significant liability if it is determined that we are promoting or have in the past promoted the "off-label" use of drugs.***

Companies may not promote drugs for "off-label" use—that is, uses that are not described in the product's labeling and that differ from those approved by the FDA. Physicians may prescribe drug products for off-label uses, and such off-label uses are common across some medical specialties. Although the FDA and other regulatory agencies do not regulate a physician's choice of treatments, the FDCA and FDA regulations restrict communications on the subject of off-label uses of drug products by pharmaceutical companies. The Office of Inspector General of the Department of Health and Human Services (OIG), the FDA, and the Department of Justice (DOJ) all actively enforce laws and regulations prohibiting promotion of off-label use and the promotion of products for which marketing clearance has not been obtained. Such liabilities would harm our business, financial condition and results of operations as well as divert management's attention from our business operations and damage our reputation.

113.    Moreover, the 1Q2017 Form 10-Q reported on the substantial regulation in the U.S. of marketing the Company's opioid drug products, stating:

***Pharmaceutical marketing is subject to substantial regulation in the U.S. and any failure by us or our collaborative partners to comply with applicable statutes or regulations could adversely affect our business.***

All marketing activities associated with NUCYNTA ER, NUCYNTA, Gralise, CAMBIA, Zipsor and Lazanda, as well as, marketing activities related to any other products that we may acquire, or for which we obtain regulatory approval, will be subject to numerous federal and state laws governing the marketing and promotion of pharmaceutical products. The FDA regulates post-approval promotional labeling and advertising to ensure that they conform to statutory and regulatory requirements. In addition to FDA restrictions, the marketing of prescription drugs is subject to laws and regulations prohibiting fraud and abuse under government healthcare programs. For example, the federal healthcare program anti-kickback statute prohibits giving things of value to induce the prescribing or purchase of products that are reimbursed by federal healthcare programs, such as Medicare and Medicaid. In addition, federal false claims laws prohibit any person from knowingly presenting, or causing to be presented, a false claim for payment to the federal government. Under this law, in recent years, the federal government has brought claims against drug manufacturers alleging that certain marketing activities caused false claims for prescription drugs to be submitted to federal programs. Many states have similar statutes or regulations that apply to items and services reimbursed under Medicaid and other state programs, and, in some states, such statutes or regulations apply regardless of the payer. If we, or our collaborative partners, fail to comply with applicable FDA regulations or other laws or regulations relating to the marketing of our products, we could be subject to criminal prosecution, civil penalties, seizure of products, injunctions and exclusion of our products from reimbursement under government programs, as well as other regulatory actions against our product candidates, our collaborative partners or us.

114.    The 1Q2017 Form 10-Q also made a general disclaimer about the adverse impact of changes in regulations and laws, stating:

***Changes in laws and regulations applicable to the pharmaceutical industry, including the opioid market, may adversely affect our business, financial condition and results of operations.***

The manufacture, marketing, sale, promotion and distribution of our products are subject to comprehensive government regulation. Changes in laws and regulations applicable to the pharmaceutical industry could potentially affect our business. For instance, federal, state and local governments have recently given increased attention to the public health issue of opioid abuse. The Centers for Disease Control (CDC) recently issued national, non-binding guidelines on the prescribing of opioids, providing recommended considerations for primary care providers when prescribing opioids, including specific considerations and cautionary information about opioid dosage increases and morphine milligram equivalents (MME). Certain payers are, or are considering, adopting these CDC guidelines. In addition, states, including the Commonwealth of Massachusetts and the State of New York, have either recently enacted or have pending legislation designed to among other things, limit the duration and quantity of initial prescriptions of immediate release form of opiates and mandate the use by prescribers of prescription drug databases. These and other initiatives may result in the reduced prescribing and use of opioids, including NUCYNTA and NUCYNTA ER, which could adversely affect our business, financial condition and results of operations. Additionally, we were named as a defendant in a case brought by the City of Chicago against a number of pharmaceutical companies marketing and selling opioid based pain medications, alleging misleading or otherwise improper promotion of opioid drugs to physicians and consumers. This case against the Company was dismissed. At the federal level, the White House Office of National Drug Control Policy continues to coordinate efforts between the FDA, the U.S. Drug Enforcement Agency (DEA) and other agencies to address this issue. The DEA continues to increase its efforts to hold manufacturers, distributors, prescribers and pharmacies accountable through various enforcement actions as well as the implementation of compliance practices for controlled substances. In addition, many state legislatures are considering various bills intended to reduce opioid abuse, for example by establishing prescription drug monitoring programs and mandating prescriber education. Further, the FDA is requiring "black-box" warnings on immediate release opioids highlighting the risk of misuse, abuse, addiction, overdose and death. In addition, during the 2016 presidential campaign, President Trump called for the DEA to restrict the amount of opioids that can be manufactured in the U.S. In March 2017, President Trump announced the creation of a commission to make recommendations to the president regarding news laws and policies to combat opioid addiction and abuse. These and other changes, and potential changes in laws and regulations, including those that have the effect of reducing the overall market for opioids or reducing the prescribing of opioids, could adversely affect our business, financial condition and results of operations.

115.   The lQ2017 Form 10-Q contained certifications by defendants Higgins and Moretti pursuant SOX that the report did not "contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report."

## THE FALSE AND MISLEADING 2015 PROXY

116.   On April 6, 2015, defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff caused Depomed to file with the SEC its 2015 Proxy Statement on Form DEF14A in connection with the 2015 Annual Meeting of Stockholders, held on May 12, 2015 (the "2015 Proxy").  In the 2015 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Staple, Anido, Dawes, Lavigne, Saks, Schoeneck, and Zenoff to the Board.  Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff negligently issued materially misleading statements with respect to these solicited votes.  Plaintiff's allegations with respect to the misleading statements in the 2015 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

117.   In support of reelecting defendants Staple, Anido, Dawes, Lavigne, Saks, Schoeneck, and Zenoff, the 2015 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations; (ii) the Audit Committee exercised oversight of the financial statements; and (iii) Depomed's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.  In particular, the 2015 Proxy stated:

**The Board's Role in Risk Oversight**

The Board's role in the Company's risk oversight process includes receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, clinical, commercial compliance, legal and regulatory, and strategic and reputational risks.  The full Board (or the appropriate Committee in the case of risks that are under the purview of a particular Committee) receives these reports to enable it to understand the Company's risk profile and the Company's risk identification, risk management and risk mitigation

strategies.  When a Committee receives the report, the Chairman of the relevant Committee reports on the discussion to the full Board at the next Board meeting. This enables the Board and its Committees to coordinate the risk oversight role.

The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting and internal controls.

118.    Defendants' statements misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  The 2015 Proxy omitted any disclosures that: (i) the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses; (ii) the Company was downplaying the risk of addiction associated with the use of those drugs; (iii) the influx of the Company's opioid drug products through this unlawful scheme has increased patient dependency on those drugs; (iv) as a result of this scheme, a significant portion of Depomed's publicly reported revenues and earnings were unlawfully obtained; (v) the Company lacked adequate disclosure controls and procedures; and (vi) as a result, the unlawful marketing scheme continued unabated at Depomed.  The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  Most importantly, the Company was reporting inflated revenues and earnings as a result of the illegal marketing of NUCYNTA and Lazanda, and therefore, its financial statements were not appropriate to include in the Company's Annual Report.  Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff were negligent in including these misleading statements in the 2015 Proxy.

119.    The 2015 Proxy harmed Depomed by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2015 Proxy, Depomed's stockholders voted to reelect defendants Staple, Anido, Dawes, Lavigne, Saks, Schoeneck, and Zenoff to Depomed's Board.

120.    The 2015 Proxy also urged stockholders to approve certain compensation and incentives for its employees, including officers, and directors.  In connection with the vote in the 2015 Proxy, stockholders approved an amendment to the Company's Articles of Incorporation to

increase the authorized shares of common stock by 100 million, with dilutive effects.  The 2015

Proxy sought to reserve shares for issuance under the 2004 Equity Incentive Plan, the 2014 Omnibus

Incentive Plan ("2014 Incentive Plan"), and the 2004 Employee Stock Purchase Plan ("ESPP").

These plans included performance goals for executives and directors, including defendants

Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff, for increasing earnings per share, cash

flow from operations, return on assets like NUCYNTA and Lazanda, and growth in product sales,

among other things.  On pages 37 through 38, the 2015 Proxy stated in support of the requested

approval:

### APPROVAL OF THE AMENDMENT TO THE COMPANY'S AMENDED AND RESTATED ARTICLES OF INCORPORATION

On February 5, 2015, the Board approved, subject to shareholder approval, an amendment to the Company's Amended and Restated Articles of Incorporation ("Articles of Incorporation") to increase the authorized shares of common stock by 100,000,000 shares (the "Amendment"), and directed that the Amendment be submitted to a vote of the shareholders at the Annual Meeting.

The text of the form of proposed Certificate of Amendment to the Articles of Incorporation increasing the number of authorized shares of our common stock from 100,000,000 shares to 200,000,000 shares is attached to this Proxy Statement as Appendix A.  If our shareholders approve the Amendment, we expect to file the Amendment with the Secretary of State of the State of California as soon as practicable following shareholder approval.  Upon filing of the Certificate of Amendment with the Secretary of State of the State of California, the second sentence of Article III of our Articles of Incorporation will read as follows:

"The total number of shares of Common Stock which this corporation is authorized to issue is 200,000,000 and the total number of shares of Preferred Stock this corporation is authorized to issue is 5,000,000."

Of the 100,000,000 shares of our common stock currently authorized, as of the close of business on March 20, 2015, there were 59,709,689 shares of common stock outstanding.  In addition to the 59,709,689 shares of common stock outstanding on March 20, 2015, an aggregate of 37,324,159 shares of common stock were reserved for issuance, of which 5,977,131 shares were reserved for issuance under our 2004 Equity Incentive Plan, all of which are subject to outstanding awards, 6,150,000 shares were reserved for issuance under our 2014 Omnibus Incentive Plan, 2,711,122 of which are subject to outstanding awards and 3,438,253 of which remain available for issuance, 536,556 shares were reserved for issuance under our 2004 Employee Stock Purchase Plan, and 24,660,472 shares were reserved for issuance upon the conversion of our 2.50% Convertible Senior Notes Due 2021.

The Board believes that the authorized shares of common stock remaining available for future issuances is not sufficient to raise additional capital and to enable the Company to respond to potential business opportunities that may arise.  Accordingly, the Board believes that it is in the Company's best interests to increase the number of authorized shares of common stock in order to provide the Company with the flexibility to issue additional shares from time to time as the Board may determine for financings, acquisitions, strategic business transactions or stock dividends.  This proposal will have no effect on the number of shares of preferred stock authorized for issuance.

The Amendment has been prompted solely by the business considerations discussed in the preceding paragraph and the Company has no current plans to issue the additional shares that would be authorized by this proposal.  If the Amendment is not approved by our shareholders, it is likely that the Company's financing and business development alternatives would be highly limited by the lack of unissued and unreserved authorized shares of common stock, and shareholder value may be harmed by this limitation.  In addition, the Company may not be able to access the capital markets, expand our business through the acquisition of other companies, products, businesses, products, product candidates or technologies, enter into strategic transactions and relationships with other companies, or pursue other business opportunities integral to our growth and success. Approval of the Amendment by our shareholders at the Annual Meeting may also avoid the expensive procedure of calling and holding a special meeting of shareholders for such a purpose at a later date.

The additional shares of common stock to be authorized by shareholder approval of the Amendment would have rights identical to the currently outstanding shares of our common stock. Approval of the Amendment and the issuance of the additional authorized shares of common stock would not affect the rights of the holders of currently outstanding shares of our common stock, except for effects incidental to increasing the number of shares of our common stock outstanding, such as dilution of any earnings per share and voting rights of current holders of common stock.  The additional shares of common stock authorized by the approval of the Amendment could be issued by the Board without further vote of our shareholders except as may be required in particular cases by our Articles of Incorporation, applicable law, regulatory agencies or the Nasdaq listing standards.   Under our Articles of Incorporation, shareholders do not have preemptive rights to subscribe to additional securities that the Company may issue, which means that current shareholders do not have a prior right thereunder to purchase any new issue of common stock in order to maintain their proportionate ownership interests in the Company.

The Amendment could, under certain circumstances, have an anti-takeover effect. The additional shares of common stock that would become available for issuance if the Amendment is approved could also be used by the Company to oppose a hostile takeover attempt or to delay or prevent changes in control or our management. For example, without further shareholder approval, the Board could strategically sell shares of common stock in a private transaction to purchasers who would oppose a takeover or favor the current Board. Although this proposal to increase the authorized common stock has been prompted by business considerations and not by

- 48 -
VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

the threat of any hostile takeover attempt (nor is the Board currently aware of any attempts directed at us), shareholders should be aware that approval of the Amendment could facilitate future efforts by the Company to deter or prevent changes in control, including transactions in which the shareholders might otherwise receive a premium for their shares over then current market prices.

If our shareholders approve the Amendment, it will become effective upon filing with the Secretary of State of the State of California, which we anticipate doing as soon as practicable following shareholder approval. However, even if our shareholders approve the proposed amendment, the Board retains discretion under California law not to implement the proposed amendment. If the Board were to exercise such discretion, the number of authorized shares would remain at the current level.

Approval of this proposal requires the affirmative vote of the holders of a majority of the outstanding shares of our common stock.

121.    The 2015 Proxy further urged stockholders to approve an advisory resolution regarding the compensation paid to named executive officers, including defendants Schoeneck and Moretti.  On page 39, the 2015 Proxy stated:

**ADVISORY VOTE ON NAMED EXECUTIVE OFFICER COMPENSATION**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") and Section 14A of the Exchange Act require that we provide our shareholders with the opportunity to vote to approve, on a nonbinding advisory basis, the compensation of our named executive officers as disclosed in this Proxy Statement in accordance with the compensation disclosure rules of the SEC. At the 2011 Annual Meeting, our shareholders indicated their preference that the Company solicit a non-binding, advisory approval of the compensation of our named executive officers annually. The Board has adopted a policy that is consistent with that preference.

The Board realizes that executive compensation is an important matter for our shareholders. Our executive compensation program is described in detail in the Compensation Discussion and Analysis ("CD&A") section of this Proxy Statement. Our program is designed to align the interests of executives and shareholders by providing a competitive balance of cash and equity compensation, benefits and development in order to attract and retain needed talent and create a collaborative, high-performing work environment that contributes to the Company's overall success.

Before you vote, we urge you to read the CD&A section of this Proxy Statement for details regarding the Company's executive compensation program, including our executive compensation philosophy, components of executive compensation, corporate and individual performance assessments, and compensation decisions for the named executive officers for the 2014 fiscal year. The Board believes the

- 49 -

information provided in the CD&A section demonstrates that the Company's executive compensation program is designed appropriately and ensures management's interests are aligned with our shareholders' interests to support the creation of shareholder value.

The say-on-pay vote is advisory, and therefore not binding on the Company, the Compensation Committee or the Board. However, the Compensation Committee will consider the outcome of the vote in deciding whether to take any action as a result of the vote and when making future compensation decisions for named executive officers.

We ask our shareholders to vote on the following resolution at the Annual Meeting:

"RESOLVED, that the Company's shareholders approve, on an advisory basis, the compensation of the Company's named executive officers, as disclosed in the Company's Proxy Statement for the 2015 Annual Meeting of Shareholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the compensation tables and the narrative disclosures related to those tables."

122.    Those statements conveyed that Depomed's compensation system encouraged proper risk management and advanced long-term stockholder value.  In reality, Depomed's compensation system actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered only short-term growth fueled by artificially inflated numbers while rewarding executives overseeing such endeavors.  Defendants knew or should have known that executives had breached their fiduciary duties to the Company and exposed the Company to significant and material risks and liability through their conduct related to the illegal marketing scheme of Depomed's opioid drug products.

123.    Under this false impression, numerous Depomed stockholders voted for compensation to named executive officers, including defendants Schoeneck and Moretti amendments, and for amendments to the 2004 Equity Incentive Plan, 2014 Incentive Plan, and ESPP in support of compensation to defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff.  This vote was made without the benefit of material information regarding these defendants' continued and ongoing failure to address the illegal marketing scheme of Depomed's opioid drug products and control deficiencies at the Company, and their continued and ongoing failure to reform the Company's incentive compensation structures to ensure they did not promote

widespread illegal activity.  These misstatements and omissions assured that stockholders would authorize the improper incentive compensation structure that fueled the unlawful marketing of opioid drug products for off-label purposes, linking the 2015 Proxy to the illegal, loss-generating corporate action described herein.

### THE FALSE AND MISLEADING 2016 PROXY

124.  On April 14, 2016, defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff caused Depomed to file with the SEC its 2016 Proxy Statement of Form DEF14A in connection with the 2016 Annual Meeting of Stockholders, held on May 18, 2016 (the "2016 Proxy").  In the 2016 Proxy, defendants solicited stockholder votes to, among other things, reelect defendants Staple, Dawes, Lavigne, Saks, Schoeneck, and Zenoff to the Board.  Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff negligently issued materially misleading statements with respect to these solicited votes.  Plaintiff's allegations with respect to the misleading statements in the 2016 Proxy are based solely on negligence; they are not based on any allegation of reckless or knowing conduct by or on behalf of these defendants, and they do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of, reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with regard to these allegations and related claims.

125.  In support of reelecting defendants Staple, Dawes, Lavigne, Saks, Schoeneck, and Zenoff, the 2016 Proxy claimed that: (i) the Board was engaged in active risk oversight of the Company, including focusing on the risk in the Company's operations; (ii) the Audit Committee exercised oversight of the financial statements; and (iii) Depomed's financial statements were accurate, and therefore appropriate for the Board's approval in the Company's Annual Report.  In particular, the 2016 Proxy stated:

**The Board's Role in Risk Oversight**

The Board's role in the Company's risk oversight process includes receiving regular reports from members of senior management on areas of material risk to the Company, including operational, financial, clinical, commercial compliance, legal and regulatory, and strategic and reputational risks.  The full Board (or the appropriate Committee in the case of risks that are under the purview of a particular Committee) receives these reports to enable it to understand the Company's risk profile and the Company's risk identification, risk management and risk mitigation

strategies.  When a Committee receives the report, the Chairman of the relevant Committee reports on the discussion to the full Board at the next Board meeting. This enables the Board and its Committees to coordinate the risk oversight role.

The Audit Committee assists the Board in fulfilling its oversight responsibilities with respect to risk management in the areas of financial reporting and internal controls.

126.    Defendants' statements misleadingly claimed that the Board: (i) maintained sufficient compliance, internal control, review, and reporting programs to identify and address misconduct; (ii) was unaware of existing material risks that could affect the Company; and (iii) maintained risk management practices.  The 2016 Proxy omitted any disclosures that: (i) the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses; (ii) the Company was downplaying the risk of addiction associated with the use of those drugs; (iii) the influx of the Company's opioid drug products through this unlawful scheme has increased patient dependency on those drugs; (iv) as a result of this scheme, a significant portion of Depomed's publicly reported revenues and earnings were unlawfully obtained; (v) the Company lacked adequate disclosure controls and procedures; and (vi) as a result, the unlawful marketing scheme continued unabated at Depomed.  The Board and Audit Committee did not exercise active and appropriate oversight over the Company's risk management and financial statements.  Most importantly, the Company was reporting inflated revenues and earnings as a result of the illegal marketing of NUCYNTA and Lazanda, and therefore, its financial statements were not appropriate to include in the Company's Annual Report.  Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff were negligent in including these misleading statements in the 2016 Proxy.

127.    The 2016 Proxy harmed Depomed by interfering with the proper governance on its behalf that follows the free and informed exercise of the stockholders' right to vote for directors.  As a result of the defendants' misleading statements in the 2016 Proxy, Depomed's stockholders voted to reelect defendants Staple, Dawes, Lavigne, Saks, Schoeneck, and Zenoff to Depomed's Board.

128.    The 2016 Proxy also urged stockholders to approve certain compensation and incentives for its employees, including officers, and directors.  The 2016 Proxy sought the increase of the Company's 2014 Incentive Plan providing long-term incentive compensation, including

equity-based awards to eligible employees and directors.  On pages 35 through 38, the 2016 Proxy stated in support of the requested approval:

### APPROVAL OF AN INCREASE IN THE NUMBER OF SHARES AVAILABLE FOR ISSUANCE UNDER THE AMENDED AND RESTATED 2014 OMNIBUS INCENTIVE PLAN

The Company's Amended and Restated 2014 Omnibus Incentive Plan (the "2014 Plan") provides for the issuance of long-term incentive compensation, including equity-based awards, to our eligible employees, consultants and non-employee directors. As of March 10, 2016, 437,273 shares remained available for issuance under the 2014 Plan. We are seeking shareholder approval of a proposal to increase the number of shares available for issuance under the 2014 Plan by 2,400,000 shares. This increase of 2,400,000 shares represents approximately 3.9% of the Company's outstanding shares of common stock as of March 10, 2016.

The following table sets forth certain information about the 2014 Plan and 2004 Plan:

| | |
|---|---|
| Number of new shares being authorized | 2,400,000 |
| Number of shares available for future awards at March 10, 2016 | 437,273 |
| Number of shares relating to outstanding stock options at March 10, 2016 | 8,635,444 |
| Number of shares outstanding at March 10, 2016 relating to awards of restricted stock units | 1,178,649 |
| Maximum option term | 10 years |
| Minimum option exercise price (relative to the market value on date of grant) | 100% |
| Weighted average remaining term of outstanding options | 7.67 years |
| Weighted average exercise price of outstanding options as of March 10, 2016 | $12.29 |
| Total number of shares available for future awards if this proposal is approved | 2,837,273 |

The foregoing table does not reflect the 371,882 shares available for issuance under the ESPP Plan as of March 10, 2016. The potential dilution from the 2,400,000 share increase requested to be approved by shareholders is approximately 3.9% as of March 10, 2016, assuming all 2,400,000 shares are issued in accordance with the 2014 Plan. The Compensation Committee has considered this potential dilution level in the context of competitive data from its peer group, and believes that the resulting dilution levels would be within normal competitive ranges.

In addition to overall dilution, the Compensation Committee considered annual dilution from the Company's equity incentive plans in approving the share increase under the 2014 Plan. The Company measures annual dilution as the total number of shares subject to equity awards granted during the year less cancellations and other shares returned to the reserve, divided by total common shares outstanding at the end of the year. The Company's dilution under the 2014 Plan for fiscal 2015 was 2.9%.

* * *

**Description of the 2014 Plan**

*Purpose.* The 2014 Plan is designed to attract and retain employees, non-employee directors and consultants of the Company and its subsidiaries, to encourage the sense of proprietorship of such employees, consultants and directors and to stimulate the active interest of such persons in the development and financial success of the Company and its subsidiaries by making awards that provide participants with a proprietary interest in the growth and performance of the Company and its subsidiaries.

* * *

*Eligibility and Types of Awards*   All of the Company's employees, consultants and non-employee directors, and employees and consultants of its subsidiaries, are eligible to receive awards under the 2014 Plan. As of March 10, 2016, approximately 478 individuals were eligible to participate in the 2014 Plan, including our executive officers and non-employee directors. Awards under the 2014 Plan may consist of incentive stock options, nonqualified stock options, stock appreciation rights, restricted stock, restricted stock units, performance units, cash awards, and other stock-based awards, any of which may be structured as a performance award subject to the achievement of specified performance goals. Only employees of the Company or its subsidiaries may receive grants of incentive stock options.

129.     The amended 2014 Incentive Plan included incentive stock options, nonqualified stock options, stock appreciation rights, restricted stock restricted stock units, performance units, cash awards, and other stock-based awards, to be structured as a performance award subject to the achievement of specified performance goals.  These performance goals included the increase of earnings per share, increase in cash flow from operations, return on assets like NUCYNTA and Lazanda, and growth in product sales, among other things.  On pages 40 through 41, the 2016 Proxy stated:

*Performance Awards.*  A performance award is a right to receive all or part of an award granted under the 2014 Plan based upon performance criteria specified by the Compensation Committee.  The Compensation Committee will determine the period over which certain specified company or individual goals or objectives must be met. The performance award may be paid in cash, shares of the Company's common stock or other awards or property, in the discretion of the Compensation Committee.

Performance awards may be structured as "qualified performance-based compensation" under Section 162(m) of the Code, or qualified performance awards. For qualified performance awards, performance goals must be established by the Compensation Committee prior to the earlier of (i) 90 days after the commencement of the period of service to which the performance goals relate or (ii) the lapse of 25%

of the period of service.  A performance goal may be based upon one or more business criteria that apply to the participant or the performance of one or more of the Company's business units or the Company as a whole, or by comparison with a peer group of companies, and must be based on one or more of the criteria set forth under the 2014 Plan, which are: (1) earnings per share; (2) net order dollars; (3) increase in cash flow; (4) increase in cash flow from operations; (5) increase in cash flow return; (6) return on net assets; (7) return on assets; (8) return on investment; (9) return on capital; (10) return on equity; (11) economic value added; (12) operating margin; (13) net profit dollars; (14) net income; (15) net income per share; (16) pretax earnings; (17) pretax earnings before interest, depreciation and amortization, or EBITDA; (18) pretax operating earnings after interest expense and before incentives, service fees, and extraordinary or special items; (19) total shareholder return; (20) debt reduction; (21) net profit growth; (22) operating income; (23) internal rate of return; (24) safety; (25) net revenue dollars; (26) capital efficiency; (27) revenue growth (including revenue growth by product); (28) growth in product sales (including as measured by prescriptions for one or more pharmaceutical products); and (29) any of the above goals determined on an absolute or relative basis or as compared to the performance of a published or special index deemed applicable by the Compensation Committee including, but not limited to, the Russell 3000 Stock Index or a group of comparable companies.

130.    The 2016 Proxy also contained a vote for approval of an increase in the number of shares available for issuance under an amended and restated ESPP.  The proposal sought to increase the shares available under the ESPP by 500,000 additional shares of common stock, with dilutive effects.  On pages 46 through 49, the 2016 Proxy stated:

### APPROVAL OF AN INCREASE IN THE NUMBER OF SHARES AVAILABLE FOR ISSUANCE UNDER THE AMENDED AND RESTATED EMPLOYEE STOCK PURCHASE PLAN

The Company's Amended and Restated 2004 Employee Stock Purchase Plan (the "ESPP") provides eligible employees with the opportunity to purchase our common stock at a discounted price. As of March 10, 2016, 371,882 shares remained available for issuance under the ESPP. We are seeking shareholder approval of a proposal to increase the number of shares available for issuance under the ESPP by 500,000 shares. This increase of 500,000 shares represents approximately 0.8% of the Company's outstanding shares of common stock as of March 10, 2016.

We believe that the ESPP is in the best interest of stockholders, as it enhances broad-based employee stock ownership; enables the Company to attract, motivate and retain the best employees with a market-competitive benefit; and does so at a reasonable cost to stockholders. We are proposing an increase in the number of shares authorized and reserved for issuance under the ESPP to enable us to continue providing this benefit to new and current employees. Our Board believes that the Company's interests are best advanced by aligning stockholder and employee interests. The ESPP is intended to provide the Company's and its subsidiaries' eligible employees with an opportunity to participate in the Company's success by

permitting them to acquire an ownership interest in the Company through periodic payroll deductions that will be applied towards the purchase of shares of our common stock at a discount from the market price.

The proposed additional 500,000 shares being requested under this proposal represents potential dilution of approximately 0.8% as of March 10, 2016 (potential dilution for this purpose is determined by dividing the 500,000 additional shares by the total number of common stock outstanding as of March 10, 2016). The dilution attributable to the ESPP for fiscal 2015 was 0.27% (which was determined by dividing the number of shares issued under the ESPP during fiscal 2015 by the total number of common stock outstanding as of December 31, 2015). The Board believes that this is a reasonable amount of potential dilution and generally in line with that of our peer companies.

We monitor our long-term dilution as a result of the ESPP by tracking the number of shares actually purchased and issued under the ESPP on an annual basis, expressed as a percentage of total shares outstanding and referred to as burn rate. Burn rate is another measure of dilution that shows how rapidly a company is depleting its shares reserved for equity compensation plans. Our ESPP burn rate for fiscal 2015 was 0.27%.

Based upon the typical levels of participation in the ESPP over the last several years, we expect the additional 500,000 shares will be sufficient to cover purchases under the plan for at least the next 4.5 years. In approving the increase to the share pool under the ESPP, the Board determined that reserving shares sufficient for approximately 4.5 years of new purchases at historical rates is in line with the practice of our peer companies.

The following description of the ESPP is a summary of its principal provisions and is qualified in its entirety by reference to the plan document, a copy of which is appended to this proxy statement as Appendix B. To the extent that there is a conflict between this summary and the actual terms of the ESPP, the terms of the ESPP will govern.

**Description of the Employee Stock Purchase Plan**

*Purpose.* The purpose of the ESPP is to provide eligible employees of the Company and its designated subsidiaries with a convenient means of acquiring an equity interest in the Company through payroll deductions, to enhance such employees' sense of participation in the affairs of the Company and its designated subsidiaries, and to provide an incentive for continued employment. The ESPP is intended to qualify as an employee stock purchase plan under Section 423 of the Code.

\* \* \*

*Eligibility.* Generally, individuals are eligible to participate in the ESPP if they are employed by the Company or any participating subsidiary for at least 20 hours per week for at least five months in any calendar year. However, no person may participate in the ESPP if, immediately after the grant of the stock purchase rights under the ESPP, such person will own stock possessing five percent or more of the

total combined voting power or value of all classes of the capital stock of the Company or any subsidiary. Further, no employee's right to purchase common stock under the ESPP may accrue at a rate which exceeds $25,000 per year and no employee may purchase more than 3,000 shares per purchase period.

As of March 10, 2016, approximately 478 employees were eligible to participate in the ESPP.

\* \* \*

*Number of Shares of Common Stock Available under the ESPP.*   Subject to adjustment as provided below, if this proposal is approved by stockholders, a maximum of 871,882 shares will be available for future issuance pursuant to the ESPP. Shares issued under the ESPP may consist, in whole or part, of authorized but unissued shares or treasury shares reacquired in private transactions or open market purchases. All shares issued under the ESPP will be counted against the maximum share limit.

\* \* \*

*Purchase of Shares.*   On the last business day of each offering period, each participating employee's payroll deductions are used to purchase shares for the employee at a 15% discount from the lesser of the fair market value of a share of common stock on the first or last day of the period. Any excess payroll deductions not applied to the purchase of shares will be refunded to each participant; provided that any amount representing a fractional share will be carried forward and applied to the next offering period (unless requested otherwise by the participant pursuant to procedures established by the administrator). As of March 10, 2016, the fair market value of our common stock was $15.19 per share. During any single year, no employee may purchase more than $25,000 of shares under the ESPP (based on market value on the applicable enrollment date(s)) or 3,000 shares in any purchase period.

\* \* \*

*Aggregate Purchases under the ESPP.*   The table below shows, as to each Named Executive Officer and the various indicated groups, the aggregate number of shares of Company common stock purchased under the ESPP. Non-employee directors are not eligible to participate in the ESPP. The closing price of our common stock on December 31, 2015 was $18.13.

| Name | Aggregate Number of Purchased Shares |
| --- | --- |
| **Named Executive Officers:** | |
| James A. Schoeneck | 17,342 |
| August J. Moretti | 8,683 |
| Matthew M. Gosling | 33,364 |

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

| | |
|---|---|
| Thadd M. Vargas | 59,028 |
| R. Scott Shively | — |
| **All current executive officers as a group (6 persons)** | 153,983 |
| **All employees, excluding current executive officers** | 1,974,135 |

131.    The 2016 Proxy further urged stockholders to approve an advisory resolution regarding the compensation paid to named executive officers, including defendants Schoeneck and Moretti.  On page 50, the 2016 Proxy stated:

**ADVISORY VOTE ON NAMED EXECUTIVE OFFICER COMPENSATION**

The Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 (the "Dodd-Frank Act") and Section 14A of the Exchange Act require that we provide our shareholders with the opportunity to vote to approve, on a nonbinding advisory basis, the compensation of our named executive officers as disclosed in this Proxy Statement in accordance with the compensation disclosure rules of the SEC. At the 2011 Annual Meeting, our shareholders indicated their preference that the Company solicit a non-binding, advisory approval of the compensation of our named executive officers annually. The Board has adopted a policy that is consistent with that preference.

The Board realizes that executive compensation is an important matter for our shareholders. Our executive compensation program is described in detail in the Compensation Discussion and Analysis ("CD&A") section of this Proxy Statement. Our program is designed to align the interests of executives and shareholders by providing a competitive balance of cash and equity compensation, benefits and development in order to attract and retain needed talent and create a collaborative, high-performing work environment that contributes to the Company's overall success.

Before you vote, we urge you to read the CD&A section of this Proxy Statement for details regarding the Company's executive compensation program, including our executive compensation philosophy, components of executive compensation, corporate and individual performance assessments, and compensation decisions for the named executive officers for the 2015 fiscal year. The Board believes the information provided in the CD&A section demonstrates that the Company's executive compensation program is designed appropriately and ensures management's interests are aligned with our shareholders' interests to support the creation of shareholder value.

The say-on-pay vote is advisory, and therefore not binding on the Company, the Compensation Committee or the Board. However, the Compensation Committee will consider the outcome of the vote in deciding whether to take any action as a result of the vote and when making future compensation decisions for named executive officers.

We ask our shareholders to vote on the following resolution at the Annual Meeting:

"RESOLVED, that the Company's shareholders approve, on an advisory basis, the compensation of the Company's named executive officers, as disclosed in the Company's Proxy Statement for the 2016 Annual Meeting of Shareholders pursuant to the compensation disclosure rules of the Securities and Exchange Commission, including the compensation tables and the narrative disclosures related to those tables."

132.    Those statements conveyed that Depomed's compensation system encouraged proper risk management and advanced long-term stockholder value.  In reality, Depomed's compensation system actually encouraged—and consistently rewarded—extreme risk-taking and widespread illegal practices, which furthered only short-term growth fueled by artificially inflated numbers while rewarding executives overseeing such endeavors.  Defendants knew or should have known that the Company's employees and fiduciaries exposed the Company to significant and material risks and liability through their conduct related to the illegal marketing scheme of Depomed's opioid drug products.

133.    Under this false impression, numerous Depomed stockholders voted for compensation to named executive officers, including defendants Schoeneck and Moretti, and for amendments to the 2014 Incentive Plan and ESPP in support of compensation to defendants Schoeneck, Moretti, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff.  This vote was made without the benefit of material information regarding these defendants' continued and ongoing failure to address the illegal marketing scheme of Depomed's opioid drug products and control deficiencies at the Company, and their continued and ongoing failure to reform the Company's incentive compensation structures to ensure they did not promote widespread illegal activity.  These misstatements and omissions assured that stockholders would authorize the improper incentive compensation structure that fueled the unlawful marketing of opioid drug products for off-label purposes, linking the 2016 Proxy to the illegal, loss-generating corporate action described herein.

## THE TRUTH SLOWLY EMERGES

134.    The truth behind the level of legal and regulatory scrutiny over the Company's off-label marketing of its opioid products began to emerge on March 28, 2017.  On that day, the U.S. Senate Committee on Homeland Security and Governmental Affairs issued a press release entitled, "Opioid Manufacturers are Subject of New McCaskill-Led, Wide-Ranging Investigation."   The

press release cited the opioid overutilization and overprescription that has caused nearly 200,000 deaths over the last fifteen years as the impetus of a wide-ranging investigation into the practice of off-label marketing among the major opioid manufacturers.  U.S. Senator Claire McCaskill, the top-ranking minority member of the Committee sought information from Depomed "including sales and marketing materials, internal addiction studies, details on compliance with government settlements and donations to third party advocacy groups."  She noted that the opioid epidemic "is the direct result of a calculated sales and marketing strategy major opioid manufacturers have allegedly pursued over the past 20 years to expand their market share and increase dependency on powerful—and often deadly—painkillers."  "To achieve this goal, manufacturers [like Depomed] have reportedly sought, among other techniques, to downplay the risk of addiction to their products and encourage physicians to prescribe opioids for all cases of pain and in high doses."  The press release stated:

> **WASHINGTON -** Opioid manufacturers will be the subject of a new, wide-ranging investigation being launched by U.S. Senator Claire McCaskill, the top-ranking Democrat on the Senate Homeland Security and Governmental Affairs Committee. McCaskill is requesting information from the manufacturers of the nation's top five prescription opioid products by 2015 sales, including sales and marketing materials, internal addiction studies, details on compliance with government settlements and donations to third party advocacy groups.
>
> The investigation will explore whether pharmaceutical manufacturers—at the head of the opioids pipeline—have contributed to opioid overutilization and overprescription as overdose deaths in the last fifteen years have approached nearly 200,000. According to the Centers for Disease Control and Prevention, deaths from opioids, including prescription opioids and heroin, reached over 30,000 in 2015 alone, and sales of prescription opioids have quadrupled since 1999.
>
> "I hear it everywhere I go—drug overdose deaths, the vast majority of them related to prescription opioids or heroin, are single-handedly destroying families and communities across Missouri and the country, and I refuse to just stand by and watch—we have an obligation to everyone devastated by this epidemic to find answers," McCaskill said.  "All of this didn't happen overnight—it happened one prescription and marketing program at a time.  The vast majority of the employees, executives, sales representatives, scientists, and doctors involved with this industry are good people and responsible actors, but some are not.  This investigation is about finding out whether the same practices that led to this epidemic still continue today, and if decisions are being made that harm the public health."

135.     Senator McCaskill followed up this announcement with a letter directed to defendant Schoeneck, dated March 28, 2017, that sought information from Depomed "related to the sales, marketing, and educational strategies it has employed to promote opioid use." Senator McCaskill specifically listed the following documents as part of the Senate Committee's ongoing investigation:

1) Documents showing any internal Depomed estimates of the risk of misuse, abuse, addiction, overdose, diversion or death arising from the use of any opioid product Depomed has manufactured, or any estimates of these risks produced by third-party contractors or vendors.

2) Any reports Depomed has generated since January 2012 summarizing or concerning compliance audits of its sales and marketing policies.

3) Marketing and business plans, including plans for direct-to-consumer and physician marketing, Depomed has developed since January 2012 for each opioid product Depomed has offered.

4) Any slide decks, presentations, talking points, or other materials Depomed has provided to participants or speakers in Depomed speakers programs since January 2012.

5) Quotas for Depomed sales representatives dedicated to opioid products concerning the recruitment of physicians for speakers programs since January 2012, broken down by year and quarter.

6) Documents sufficient to show Depomed expenses relating to the entertainment of physicians by sales representatives dedicated to opioid products since January 2012, broken down by year and quarter.

7) Documents sufficient to show Depomed funding of CME modules or other educational presentations for physicians, nurses, pharmacists, or other medical professionals since January 2012, documents sufficient to show the recipients of the funding, and copies of the slides, videos, handouts, promotional materials, and any other related materials produced.

8) Documents sufficient to show funding Depomed has provided to the following entities since January 2012, including the date of specific payments, the amount of each payment, the purpose of each payment (CME funding, research funding, etc.), if specified, year-end or year-to-date payment totals per year, and the cumulative total payments to each organization….

9) Any reports Depomed has issued to government agencies since January 2012 in accordance with corporate integrity agreements or other settlement agreements.

10) Any document productions Depomed has made since January 2012 to the Department of Justice, the Department of Health and Human Services Office of Inspector General, state attorneys general, any committee or subcommittee of the U.S. Congress, and any U.S. Attorney's office related to the issues outlined in the requests above or Depomed's opioid products generally.

136.     Over the next couple days, this news spread through the market, causing Depomed's stock to fall by nearly 16%, a loss of $2.35 per share by March 31, 2017.  The Company's stock closed at $12.55 per share on March 31, 2017, compared to $14.90 per share on March 27, 2017, erasing more than $145.9 million in market capitalization.

137.     On August 7, 2017, defendants finally acknowledged the increased legal and regulatory scrutiny of Depomed's illegal marketing practices of its opioid drug products in a Quarterly Report on Form 10-Q filed with the SEC reporting its financial and operating results for the fiscal quarter ended June 30, 2017 (the "2Q2017 Form 10-Q").  Defendants Higgins and Moretti signed the 2Q2017 Form 10-Q.  In the 2Q2017 Form 10-Q, announcing the financial results for the second fiscal quarter, the Company announced not only the Senate Committee's investigation, but previously undisclosed investigations being conducted by the Office of the Attorney General for Maryland and the U.S. Department of Justice.  These investigation also focused on the Company's sales and marketing of its opioid drug products.  The 2Q2017 Form 10-Q stated:

**_Opioid-Related Request and Subpoenas_**

The Company and a number of other pharmaceutical companies recently received a request for information from the ranking minority member of the United States Senate Committee on Homeland Security and Governmental Affairs related to the promotion of opioids.  The Company has voluntarily furnished information responsive to such request.

The Company and a number of other pharmaceutical companies recently received subpoenas related to opioid sales and marketing from the Office of the Attorney General of Maryland and the United States Department of Justice.  The Company is currently cooperating with the State of Maryland and the Department of Justice in their respective investigations.

* * *

We recently received a letter from Senator Claire McCaskill, the Ranking Member on the United States Senate Committee on Homeland Security and Governmental Affairs, requesting certain information from the Company regarding its commercialization of opioid products.  We have voluntarily furnished information responsive to Sen. McCaskill's requests.  We recently received an Administrative Subpoena from the Office of the Attorney General of Maryland seeking documents and information regarding the sales and marketing of opioid products.  We are currently cooperating with the State of Maryland in its investigation.  We recently received a subpoena from the United States Department of Justice (DOJ) seeking

documents and information regarding the sales and marketing of opioid products. We are currently cooperating with the DOJ in its investigation.

138.    The increased legal and regulatory scrutiny forced the Individual Defendants to adjust the Company's prior financial outlook.  In the Company's press release announcing the financials of the 2Q2017 Form 10-Q, the Company lowered its 2017 financial guidance from $405 million to $425 million to $395 million to $410 million due to "increased pressure on short-acting and long-acting opioid markets by federal and state governments, managed care and other stakeholders," as well as "legal expenses associated with responding to recent government inquiries and subpoenas directed to opioid manufacturers."  The pressures also caused the Company to lower its earnings, with adjusted earnings before interest, taxes, depreciation, and amortization decreasing from $120 million to $130 million to $107 million to $117 million.

139.    On this news, Depomed's stock plummeted more than 33%, or $3.09 per share on August 8, 2017, to close at $6.15 compared to the previous trading day's closing of $9.23, erasing more than $194.3 million in market capitalization.

140.    In total during this period, Depomed's stock price has fallen over 80%, from a high of $33.28 per share shortly after the acquisition of NUCYNTA, to a low of $6.15 per share on August 8, 2017, after revealing ongoing investigations, a loss of $27.14 per share.  Market capitalization fell more than $1.6 billion in little over two years.

## REASONS THE STATEMENTS WERE IMPROPER

141.    The statements referenced above were each improper when made because they failed to disclose and misrepresented the following material, adverse facts, which the Individual Defendants knew, consciously disregarded, or were reckless in not knowing:

(a)    that the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses;

(b)    that the Company was downplaying the risk of addiction associated with the use of those drugs;

(c)    that the influx of the Company's opioid drug products through this unlawful scheme has increased patient dependency on those drugs;

1       (d)    as a result of this scheme, a significant portion of Depomed's publicly reported

2  revenues and earnings were unlawfully obtained;

3       (e)    failed to maintain adequate disclosure procedures with respect to Depomed's

4  operations and risk management; and

5       (f)    as a result of the foregoing, the officers' and directors' representations

6  concerning the Company's business, prospects, and financial standing were improper.

7                  **DAMAGES TO DEPOMED**

8      142.    As a result of the Individual Defendants' improprieties, Depomed disseminated

9  improper, public statements that omitted or failed to disclose that the Company was engaged in an

10  unlawful scheme to market its opioid drug products for off-label uses, increasing patient dependency

11  on those drugs, and downplaying the risk of addiction associated with the use of those drugs.  These

12  improper statements have devastated Depomed's credibility as reflected by the Company's

13  approximately $1.6 billion, or 80%, market capitalization loss.

14      143.    Depomed's performance issues also damaged its reputation within the business

15  community and in the capital markets.  In addition to price, Depomed's current and potential

16  customers consider a company's trustworthiness, stability, and ability to accurately describe its

17  business operations.  Customers are less likely to use the Company's drug products if they are

18  associated with unlawful marketing schemes designed to create dependency.  Government

19  authorities, including the FDA, may seek to prohibit or limit the sale of the Company's opioid

20  products or impose civil and criminal penalties when a violation is found.  As evidence, the U.S.

21  Senate Committee on Homeland Security and Governmental Affairs, Office of the Attorney General

22  for Maryland, and the Department of Justice have launched extensive investigations into the

23  Company's unlawful marketing practices.  Depomed's ability to raise equity capital or debt on

24  favorable terms in the future is now impaired.  In addition, the Company stands to incur higher

25  marginal costs of capital and debt because the improper statements and misleading projections

26  disseminated by the Individual Defendants have materially increased the perceived risks of investing

27  in and lending money to the Company.

28

144.    Further, as a direct and proximate result of the Individual Defendants' actions, Depomed has expended, and will continue to expend, significant sums of money.  Such expenditures include, but are not limited to:

(a)    costs incurred from defending and paying any settlement in the class actions for violations of federal securities laws;

(b)    costs or expenditures incurred through the current ongoing investigations into the Company's unlawful scheme by the U.S. Senate Committee on Homeland Security and Governmental Affairs, Office of the Attorney General for Maryland, and the U.S. Department of Justice;

(c)    costs incurred to investigate the wrongdoing internally; and

(d)    costs incurred from compensation and benefits paid to the defendants who have breached their duties to Depomed.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

145.    Plaintiff brings this action derivatively in the right and for the benefit of Depomed to redress injuries suffered, and to be suffered, by Depomed as a direct result of violation of securities law, breaches of fiduciary duty, waste of corporate assets, and unjust enrichment, as well as the aiding and abetting thereof, by the Individual Defendants.  Depomed is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

146.    Plaintiff will adequately and fairly represent the interests of Depomed in enforcing and prosecuting its rights.

147.    Plaintiff has continuously been a stockholder of Depomed since January 2017 and is a current Depomed stockholder.

148.    The current Board of Depomed consists of the following seven individuals: defendants Fogarty, Dawes, Higgins, Lavigne, Staple, and Tyree, and nondefendant McKee. Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Fogarty, Dawes, Higgins, Lavigne, Staple, and Tyree Face a Substantial Likelihood of Liability for Their Misconduct**

149.    As alleged above, defendants Fogarty, Dawes, Higgins, Lavigne, Staple, and Tyree breached their fiduciary duties of loyalty by making improper statements in the Company's SEC filings regarding Depomed's ongoing, systematic practice of unlawfully marketing its highly addictive opioid products for off-label uses to maximize corporate profits, revenues, and earnings.

150.    Defendants Fogarty, Dawes, Higgins, Lavigne, Staple, and Tyree either knew of Depomed's illegal off-label marketing of NUCYNTA and Lazanda or, in breach of their fiduciary duties, knowingly failed to exercise their fiduciary duties to monitor Depomed's compliance with off-label marketing laws.  Depomed faces significant criminal and civil liability for FDCA, PHSA, and the FCA violations relating to the off-label marketing of NUCYNTA and Lazanda. Accordingly, defendants Fogarty, Dawes, Higgins, Lavigne, Staple, and Tyree face a substantial likelihood of liability, excusing a demand.

151.    Defendants Dawes, Lavigne, and Staple are responsible for the negligently made statements in the materially misleading 2015 and 2016 Proxies.  It is against public policy to indemnify individuals for violations of section 14(a) of the Exchange Act.  Accordingly, an indemnification provided by the Company to defendants Dawes, Lavigne, and Staple does not protect them for violations of section 14(a) in the 2015 and 2016 Proxies.  Accordingly, defendants Dawes, Lavigne, and Staple face a substantial likelihood of liability, excusing a demand.

152.    Defendants Dawes, Lavigne, Staple, and Tyree, as members of the Audit Committee, reviewed and approved the improper statements and earnings guidance.  The Audit Committee's Charter provides that it is responsible for compliance with accounting, legal, and regulatory requirements.  In particular, the Audit Committee is charged with assisting "the Board in the oversight of the Company's compliance with applicable legal, regulatory and tax requirements." Thus, the Audit Committee Defendants were responsible for knowingly or recklessly allowing the improper statements related to the Company's earnings guidance and financial and disclosure controls.  Moreover, the Audit Committee Defendants reviewed and approved the improper public filings filed with the SEC.  Despite their knowledge or reckless disregard, the Audit Committee

1   Defendants caused these improper statements.  Accordingly, the Audit Committee Defendants

2   breached their fiduciary duty of loyalty and good faith because they participated in the wrongdoing

3   described herein.  Thus, defendants Dawes, Lavigne, Staple, and Tyree face a substantial likelihood

4   of liability for their breach of fiduciary duties so any demand upon them is futile.

5   **Demand Is Excused as to Defendant Higgins Because He Lacks Independence**

6   153.    The principal professional occupation of defendant Higgins is his employment with

7   Depomed, pursuant to which he has received and continues to receive substantial monetary

8   compensation and other benefits as alleged above.  Accordingly, defendant Higgins lacks

9   independence from defendants Fogarty, Dawes, Lavigne, Staple, and Tyree, and nondefendant

10  McKee due to his interest in maintaining his executive position as CEO and President at Depomed.

11  This lack of independence renders defendant Higgins incapable of impartially considering a demand

12  to commence and vigorously prosecute this action.

13  154.    Defendant Higgins receives incentive compensation under the 2004 Equity Incentive

14  Plan, 2014 Incentive Plan, and ESPP as a direct result of the false and misleading 2015 and 2016

15  Proxies, which defendants Dawes, Lavigne, and Staple caused the Company to file with the SEC.

16  Accordingly, defendant Higgins lacks independence from defendants Dawes, Lavigne, and Staple

17  due to his interest in maintaining this compensation.  This lack of independence renders defendant

18  Higgins incapable of impartially considering a demand to commence and vigorously prosecute this

19  action.

20  155.    Plaintiff has not made any demand on the other stockholders of Depomed to institute

21  this action since such demand would be a futile and useless act for at least the following reasons:

22  (a)    Depomed is a publicly held company with over 62.9 million shares

23  outstanding and thousands of stockholders as of August 4, 2017;

24  (b)    making demand on such a number of stockholders would be impossible for

25  plaintiff who has no way of finding out the names, addresses, or phone numbers of stockholders; and

26  (c)    making demand on all stockholders would force plaintiff to incur excessive

27  expenses, assuming all stockholders could be individually identified.

28

1

2

3

## COUNT I

**Against Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks,**
**and Zenoff for Violation of Section 14(a) of the Exchange Act**

4      156.    Plaintiff incorporates by reference and realleges each and every allegation contained

5    above, as though fully set forth herein.

6      157.    The section 14(a) Exchange Act claims alleged herein are based solely on negligence.

7    They are not based on any allegation of reckless or knowing conduct by or on behalf of defendants

8    Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff.  The section 14(a) claims alleged

9    herein do not allege and do not sound in fraud.  Plaintiff specifically disclaims any allegations of,

10   reliance upon any allegation of, or reference to any allegation of fraud, scienter, or recklessness with

11   regard to these nonfraud claims.

12     158.    Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff negligently

13   issued, caused to be issued, and participated in the issuance of materially false and misleading

14   written statements to stockholders that were contained in the 2015 and 2016 Proxies.  The 2015 and

15   2016 Proxies contained proposals to the Company's stockholders that they vote to reelect the

16   members of the Board.  The 2015 and 2016 Proxies, however, misrepresented and failed to disclose

17   and explain that: (i) the Company was engaged in an unlawful scheme to market its opioid drug

18   products for off-label uses; (ii) the Company was downplaying the risk of addiction associated with

19   the use of those drugs; (iii) the influx of the Company's opioid drug products through this unlawful

20   scheme has increased patient dependency on those drugs; (iv) as a result of this scheme, a significant

21   portion of Depomed's publicly reported revenues and earnings were unlawfully obtained; (v) the

22   Company lacked adequate disclosure controls and procedures; and (vi) as a result, the unlawful

23   marketing scheme continued unabated at Depomed.  By reasons of the conduct alleged herein,

24   defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff violated section 14(a) of

25   the Exchange Act.  As a direct and proximate result of these violations, stockholders voted in favor

26   of reelecting defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff to the Board.

27   Defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff's reelection led to the

28   continuation of the wrongful practices described herein.

159.     Plaintiff, on behalf of Depomed, thereby seeks relief for damages inflicted upon the Company in connection with the improper election of defendants Schoeneck, Staple, Anido, Dawes, Lavigne, Saks, and Zenoff based upon the false and misleading 2015 and 2016 Proxies, and also seeks new director elections on the basis of a special proxy with appropriate corrective disclosures.

<u>COUNT II</u>

**Against the Individual Defendants for Breach of Fiduciary Duty**

160.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

161.     The Individual Defendants owed and owe Depomed fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe Depomed the highest obligation of good faith, fair dealing, loyalty, and due care.

162.     The Individual Defendants and each of them, violated and breached their fiduciary duties of candor, good faith, and loyalty.  More specifically, the Individual Defendants violated their duty of good faith by creating a culture of lawlessness within Depomed, and/or consciously failing to prevent the Company from engaging in the unlawful acts complained of herein.

163.     The Officer Defendants, defendants Higgins, Moretti, and Schoeneck, either knew, were reckless, or were grossly negligent in disregarding the illegal activity of such substantial magnitude and duration.   The Officer Defendants either knew, were reckless, or were grossly negligent in not knowing that: (i) the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses; (ii) the Company was downplaying the risk of addiction associated with the use of those drugs; (iii) the influx of the Company's opioid drug products through this unlawful scheme has increased patient dependency on those drugs; (iv) as a result of this scheme, a significant portion of Depomed's publicly reported revenues and earnings were unlawfully obtained; and (v) the Company lacked adequate disclosure controls and procedures.  Accordingly, the Officer Defendants breached their duty of care and loyalty to the Company.

164.     Director Defendants, defendants Higgins, Fogarty, Staple, Dawes, Lavigne, Tyree, Schoeneck, Zenoff, Saks, Anido, and Savage, as directors of the Company, owed Depomed the highest duty of loyalty.  These defendants breached their duty of loyalty by recklessly permitting the

improper activity concerning the Company's systematic and pervasive unlawful wrongdoing described herein. The Director Defendants knew or were reckless in not knowing that: (i) the Company was engaged in an unlawful scheme to market its opioid drug products for off-label uses; (ii) the Company was downplaying the risk of addiction associated with the use of those drugs; (iii) the influx of the Company's opioid drug products through this unlawful scheme has increased patient dependency on those drugs; (iv) as a result of this scheme, a significant portion of Depomed's publicly reported revenues and earnings were unlawfully obtained; and (v) the Company lacked adequate disclosure controls and procedures. Accordingly, the Director Defendants breached their duty of loyalty to the Company.

165. The Audit Committee Defendants, defendants Staple, Dawes, Lavigne, Tyree, and Anido, breached their fiduciary duty of loyalty by approving the statements described herein which were made during their tenure on the Audit Committee, which they knew or were reckless in not knowing contained improper statements and omissions. The Audit Committee Defendants completely and utterly failed in their duty of oversight, and failed in their duty to appropriately review financial results, as required by the Audit Committee Charter in effect at the time.

166. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Depomed has sustained significant damages, as alleged herein. As a result of the misconduct alleged herein, these defendants are liable to the Company.

167. Plaintiff, on behalf of Depomed, has no adequate remedy at law.

### COUNT III

**Against the Individual Defendants for Waste of Corporate Assets**

168. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

169. As a result of the Individual Defendants' failure to implement adequate internal controls to ensure that the Company's SEC filings were accurate, Depomed is subject to a securities class action lawsuit. Further, the Company is now the subject of ongoing investigations led by the U.S. Senate Committee on Homeland Security and Governmental Affairs, Office of the Attorney General for Maryland, and the U.S. Department of Justice. The Individual Defendants have caused

Depomed to waste its assets by forcing it to defend itself in the ongoing litigation and cooperate in ongoing investigations, in addition to any ensuing costs from a potential settlement, adverse judgment, or criminal penalties.

170.    In addition, by failing to conduct proper supervision, the Individual Defendants have caused Depomed to waste its assets by paying improper compensation and bonuses to certain of its executive officers and directors that breached their fiduciary duty.

171.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

172.    Plaintiff, on behalf of Depomed, has no adequate remedy at law.

## COUNT IV

### Against the Individual Defendants for Unjust Enrichment

173.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

174.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Depomed.  The Individual Defendants were unjustly enriched as a result of the compensation and director remuneration they received while breaching fiduciary duties owed to Depomed.

175.    Plaintiff, as a stockholder and representative of Depomed, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

176.    Plaintiff, on behalf of Depomed, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, on behalf of Depomed, demands judgment as follows:

A.    Against all of the defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the defendants' breaches of fiduciary duties, waste of corporate assets, and unjust enrichment;

B.      Directing Depomed to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Depomed and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following Corporate Governance Policies:

1.      A proposal to strengthen the Company's controls over its marketing and sales practices;

2.      a proposal to strengthen the Company's controls over financial reporting;

3.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

4.      a provision to permit the stockholders of Depomed to nominate at least three candidates for election to the Board; and

5.      a proposal to strengthen Depomed's oversight of its disclosure procedures;

C.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of defendants' trading activities or their other assets so as to assure that plaintiff on behalf of Depomed has an effective remedy;

D.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: November 10, 2017                    ROBBINS ARROYO LLP
                                            BRIAN J. ROBBINS
                                            GEORGE C. AGUILAR
                                            LINDSEY C. HERZIK


                                                  /s/ *Brian J. Robbins*
                                            BRIAN J. ROBBINS

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

600 B Street, Suite 1900
San Diego, CA 92101
Telephone: (619) 525-3990
Facsimile (619) 525-3991
E-mail: brobbins@robbinsarroyo.com
        gaguilar@robbinsarroyo.com
        lherzik@robbinsarroyo.com

Attorneys for Plaintiff

1218697

- 73 -

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

## VERIFICATION

I, John Solak, hereby declare as follows:

I am the plaintiff in the within entitled action. I have read the Verified Stockholder Derivative Complaint for Violation of Securities Law, Breach of Fiduciary Duty, Waste of Corporate Assets, and Unjust Enrichment. Based upon discussions with and reliance upon my counsel, and as to those facts of which I have personal knowledge, the Complaint is true and correct to the best of my knowledge, information, and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Signed and Accepted:                                        Dated: NOV 9 2017

JOHN SOLAK